No. 21743.

No. 21748.

ELAINE CHEW AND HOLT CHEW, AND INTERMOUNTAIN LAND DEVELOPMENT ·CO. *v.* ACACIA MUTUAL LIFE INSURANCE COMPANY, HULSEY E. FERRILL, OLGA FERRILL, G. P. JAPHA, GERTRUDE HAAS, HELEN BUSH AS THE PUBLIC TRUSTEE OF THE COUNTY OF JEFFERSON AND STATE OF COLORADO, TRUSTEE COMPANY, A COLORADO CORPORATION, HELENE C. ZARLENGO, HENRY E. ZARLENGO.

(437 P.2d 339)

Decided February 5, 1968.    Rehearing denied March 4, 1968.

44

LESLIE A. GROSS, for plaintiffs in error Elaine Chew and Holt Chew.

FRANCIS R. SALAZAR, for plaintiff in error Intermountain Land Development Company.

GORSUCH, KIRGIS, CAMPBELL, WALKER AND GROVER, CHARLES E. RHYNE, for defendant in error Acacia Mutual Life Insurance Company.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

Two writs of error are herein consolidated. In the two cases Elaine and Holt Chew, hereinafter referred to as the Chews, in Case No. 21743, and Intermountain Land Development Company (Intermountain), in Case No. 21748 respectively, seek reversal of district court judgment confirming a sheriff's sale on foreclosure of a deed of trust. The Chews additionally challenge the correctness of the deficiency judgment against them in the sum of $181,069.36.

Other parties involved in the foreclosure will be referred to as follows: Hulsey E. Ferrill and Olga Ferrill as Ferrills; Henry E. Zarlengo and Helene C. Zarlengo as Zarlengos; G. P. Japha and Gertrude Haas as Japha and Haas; Trustee Company by name; Acacia Mutual Life Insurance Co. as Acacia; Morrison & Morrison, Inc. by name. Only the Chews, Acacia and Intermountain are parties in these writs of error.

On September 15, 1961, the Chews and Ferrills executed and delivered a promissory note in the amount of $570,000 payable to Morrison & Morrison, Inc. The note was secured by a deed of trust on real estate in Jefferson County known as Yukon Manor, an apartment complex, which at that time was owned by Holt Chew and Hulsey E. Ferrill. Morrison & Morrison, Inc. immediately endorsed the note and assigned the deed of trust to Acacia. The assignment of the deed of trust was recorded on September 19, 1961.

The Zarlengos recorded a second deed of trust dated October 25, 1960, on July 13, 1962, which secured a promissory note in the amount of $60,000. This deed of trust was subsequently assigned to the Chews on March 16, 1964, and recorded on March 31, 1964.

On March 15, 1963, Holt Chew and Hulsey E. Ferrill conveyed the real estate by warranty deed to the Turnquists, the deed being recorded on March 21, 1963. On December 10, 1963, the Turnquists in turn conveyed

the real estate to the Trustee Company by warranty deed, recorded on December 17, 1963. By this deed Trustee Company assumed and agreed to pay the promissory note and deed of trust which had been assigned to and was being held by Acacia.

A third deed of trust dated December 9, 1963, was recorded by the Turnquists on January 16, 1964, having been given by the Trustee Company to the Turnquists as security for a promissory note in the principal sum of $75,000. This deed of trust was assigned by the Turnquists to George A. Kern on January 14, 1964, who, in turn, assigned it to Haas on January 21, 1964, who recorded it on that date.

When Trustee Company defaulted on the note, Acacia brought this action to foreclose its first deed of trust naming the Chews and Ferrills, the makers, as additional defendants and seeking to impose a personal judgment against them for any deficiency between the bid price on the sale and the amount due on the loan. A receiver was appointed on March 23, 1964, by order of court, to take possession and manage the property involved, collecting rents, issues and profits during pendency of the litigation and until deed issued from the sheriff.

On June 11, 1964, the trial court entered its decree of foreclosure and order of sale at public auction, allowing any party to the action to become a purchaser. The court found that the total amount due Acacia on the note including interest, attorneys' fees and costs up to that time was $555,043.62. The court retained jurisdiction "for the purposes of (1) entering an order confirming or disapproving and setting aside said sale, and (2) of entering a deficiency judgment based upon said return of sale, if any deficiency there be."

The sale was held August 4, 1964. Acacia was the only bidder at a figure of $380,000 with a resulting deficiency of $181,069.36 including accrued interest due between the court order and sale. Objections were filed by the Chews and Ferrills to confirmation of the sale

and entry of deficiency judgment, but after hearing the trial court denied the objections and entered the aforementioned judgments. Motion for a new trial was denied.

A notice of intention to redeem was filed by Intermountain, which held the third deed of trust by virtue of an assignment from Japha and Haas. Intermountain, however, was unable to secure a title commitment satisfactory to those persons who were putting up the funds and as a result the period of redemption expired. Intermountain joined in and adopts the Chews' briefs as their own.

In objecting to the sale in the trial court, the Chews asserted, among nine grounds advanced for consideration by the judge: (a) that Acacia's bid was shockingly and unconscionably below the fair value of the property; and (b) Acacia's bid was made without any regard to the fair value of the property, solely for the purpose of imposing substantial personal liability upon the Chews who were no longer owners of the property and who did not have the final right of redemption.

In support of these contentions, the Chews offered into evidence a considerable volume of correspondence between Acacia and its Denver agents, Morrison & Morrison, Inc., to whom the payments of principal and interest were being made up to the date of the default. The court refused to consider any of the correspondence with the exception of one letter dated April 8, 1964, which was admitted into evidence.

The erroneous exclusion of the proffered evidence is assigned as one of the grounds for reversal of the judgment. It is contended that the letters together with other evidence before the court showing inadequacy of the bid price presents a total picture which, if the trial court had considered it, would have overwhelmingly demonstrated the unfairness of the sale.

All of the grounds asserted may be summed up into

the single question to be answered in this writ of error: *WAS THE PRICE BID BY ACACIA UNDER THE TOTALITY OF THE CIRCUMSTANCES IN THIS RECORD SO UNFAIR AS TO SHOCK THE CONSCIENCE OF THE COURT?*

■ We answer the question in the affirmative.

At the hearing on the objections to confirmation of the sale and to the entry of a deficiency judgment the evidence was not in conflict. Four appraisers gave their opinions as to the fair market value of the property. The four values given were as follows: $575,000, $550,000, $535,000, $525,000. The arithmetical average of the four is slightly in excess of $546,000. No appraisers testified on behalf of Acacia so no contrary or different appraisal value was offered by Acacia, but in the correspondence which the court refused to consider were numerous letters showing that Acacia had been informed that it could reasonably expect to sell the property "as is" for $500,000 to $525,000. On all of the evidence therefore before the court, and the documentary evidence which the court should have considered — but refused to — there was no justification for the bid of only $380,000 on the property. The court made a finding that the fair market value of the property was $546,000 but then modified the finding by stating that the figure represented the fair market value after an expenditure of from $22,000 to $60,000 for refurbishing the property. This finding is not supported by the evidence. In the one letter in Acacia's files which the court did admit into evidence is the following:

"\* \* \* After such discussion, we have come up with the conclusion that the estimated market value of the property in its present condition is around $500,000 to $525,000.

"We do believe, however, that if and when the time comes when sufficient funds can be put into the property to restore it to first-class condition, new carpets put on the floors, new drapes hung, some new refrigerators

and stoves installed, which might necessitate the expenditure of somewhere around $70,000 to $90,000, that the value of the property then would be somewhere in the neighborhood of $640,000 to $720,000. I realize that *this latter figure is not the one you want at this time,* but I did think it well to tell you that we do think the property *has considerable value in this present market* when and if it is put in first-class condition." (Emphasis added.)

In a letter dated April 20, 1964, to Acacia, which should have been admitted into evidence as being relevant and material, it was stated that in making the valuation of Yukon Manor in an "as is" condition, the four men from Morrison & Morrison, Inc. "tried to be very conservative."

These appraisals made by Acacia's agent Morrison & Morrison, Inc. were made about four months prior to the foreclosure sale and about eight or nine months prior to the hearing on objections to confirmation of the foreclosure sale and entry of a deficiency judgment. At the hearing Frank L. Lort, Vice President of Morrison & Morrison, Inc., in charge of property management, appointed by the court as receiver for the Yukon Manor property on March 23, 1964, testified that by using the rental income collected, slightly more than a third of the apartments had been completely redecorated, and that he had "done many other things in the way of management."

The redecorating and refurbishing of the apartments and other improvements were made after the "conservative" appraisal of the property's value by Acacia's agent Morrison & Morrison, Inc. Morrison & Morrison, Inc. recognized in the letter dated April 7, 1964, that improvements would increase the value of the property to a greater extent than merely the cost expended. Since extensive improvements were made, the "conservative" appraisal by Acacia's agents that the property

was worth between $500,000 and $525,000 was on the low side.

Using the average valuation given by the four appraisers creates a disparity of more than $166,000 between the price bid by Acacia and the fair market value of the property. Using the lowest appraisal in evidence of $525,000 as the fair market value of the property, this still creates a disparity of $145,000 between the price bid and the fair market value of the property. The record contains no justifiable figure to support a bid so grossly below the lowest appraised valuation of the property. With the deficiency judgment against the Chews, there would clearly be real potential for a highly profitable transaction whereas equity demands that Acacia has only the right to the recovery of its indebtedness, *i.e.*, to be made whole.

Ordinarily, inadequacy of the price paid is not sufficient cause, *standing alone,* for setting aside of a judicial sale, *Conway v. John,* 14 Colo. 30, 23 Pac. 170, but the other evidence proffered which the court refused to admit into evidence—we hold erroneously—concerning which the court closed its eyes, showed that Acacia did not concern itself primarily with the fair market value of the property or what it could reasonably expect to receive from its sale. Rather, the correspondence indicates that Acacia set out to determine in advance of the sale how much of a deficiency the Chews would be financially liable for. As one of the letters said:

"We also recommend that you send the papers to our attorneys, Gorsuch, Kirgis, Campbell, Walker and Grover to commence foreclosure through the courts rather than the public trustee. I am suggesting this, as it is my understanding, not being a lawyer, that if this method is used to obtain a judgment against the signers of the note, you can foreclose under the judgment. I am making this recommendation as Messrs. Chew and

Ferrill have other property and other means. I do not believe they would want this to happen."

Thereafter, Acacia agents were instructed in another letter, *inter alia*:

"It is also going to be important to us *in determining our bid* to know as much as we can about the current financial position of both Mr. Ferrill and Mr. Chew. We shall appreciate your asking Dun & Bradstreet to make a very careful and complete report on each of these gentlemen and their respective businesses. If you have an additional reporting service which you feel might cover angles Dun & Bradstreet could possibly pass up, then we wish you would order the additional reports from the other source. In addition to this it would seem to us that with your connection and our connection with the banks you should be able to get some help in lining up a picture of the financial responsibility of these two gentlemen. If you have any suggestions to us as to what we might do in order to investigate their current financial picture, do not hesitate to let me know.

"We are going to have to keep moving right along on this so will you please let the above matters have your prompt attention."

In still a further letter from Acacia we find the following:

"We have your letter of July 1 enclosing the credit reports and your current appraisal of the subject property. We understand that Mr. Van Court is working on his current appraisal and we should have that within a few days.

"We appreciate the effort you have made to investigate the financial position of Mr. Ferrill and Mr. Chew. We are currently having an investigation run by one of our own sources * * *. It behooves us to complete our final investigation and to get all information in about the value of the property as quickly as possible as we must not only thoroughly analyze it but we have to bring the case to the attention of our Finance Com-

mittee and consult with them on the bidding at the coming foreclosure.

"I think you should return to \* \* \* the report which they sent to you on Mr. Chew. To be perfectly frank, we think this is about as poor a piece of reporting as we have seen. This is not the first instance recently that \* \* \* has tried to pass off a sloppy job. Here at this office we refuse to pay for any report such as these. The reports are returned and the credit company instructed to put more competent help on the job. For the report which is attached hereto to completely ignore the fact that Mr. Chew is a well-known business man and a prominent Chevrolet dealer is inexcusable."

One of the officers of Morrison & Morrison, Inc., Acacia's Denver agent, also became receiver of the property and the evidence showed that rentals obtained during the pendency of the litigation instead of being used to meet the accruing taxes and interest were expended on the property. The uncontradicted evidence is that a refurbishing program would further enhance the resale value of the real estate. By use of the rentals for improvements and not applying them to interest and taxes the indebtedness was increased from $524,000 to $561,000 and caused a corresponding increase in the deficiency of $35,000 while at the same time enhancing the resale value of the property for which no consideration was given.

The court in ordering a foreclosure sale and retaining jurisdiction to review the bid price and to either confirm or reject it is performing a judicial function as opposed to merely a ministerial act. The proceeding is addressed to the equity side of the court and to the equitable rather than purely legal control. The inadequacy of price may be such as to be not itself an indication of unfairness. When taken in connection with other circumstances it is ground for setting the sale aside and ordering a resale. See *3 Jones, Mortgages,* sec. 2108.

■ We hold in this case that the bid of $380,000 was not made in good faith on the basis of what the security could reasonably be expected to produce on sale at its fair market value. It appears that Acacia in making its bid determined that it could successfully collect a substantially large deficiency from the Chews. From all the figures at Acacia's disposal and the evidence before the court it can be determined that with the $181,000 deficiency judgment collected and not required to be credited against the indebtedness, Acacia would have the equivalent of three years prepayment of principal and interest on the debt and be placed in a position to realize upwards to $276,000 profit by resale of the property under circumstances which would no longer be a forced sale. This sale if allowed leads inevitably to the conclusion that double recovery is not only a distinct probability but was intended to be effectuated.

The judgment is reversed and the sale of the property is hereby set aside. The cause is remanded with direction that the court conduct a new foreclosure sale after opportunity for additional and up-dated appraisals of the present fair market value of the property; confirmation of the sale to be in harmony with the views expressed herein, and with due regard to a strict accounting of the rents, issues and profits against accrued interest and taxes during the pendency of the litigation.

Mr. Justice McWilliams dissents.