817 P.2d 1221

Calvin W. ARMSTRONG and Dorothy
M. Armstrong, Plaintiffs–
Appellees,

v.

William P. CSURILLA, Josephine
Csurilla and Victoria L. Lamkin,
Defendants–Appellants.

No. 19041.

Supreme Court of New Mexico.

Aug. 27, 1991.

Michael Allison, Albuquerque, for defendants-appellants.

Thomas G. Fitch, Socorro, for plaintiffs-appellees.

## OPINION

MONTGOMERY, Justice.

When property subject to a mortgage or other lien is sold in foreclosure proceedings, the buyer is usually the mortgagee or other lien creditor and the price for which the property is "bought in" is sometimes significantly less than the property's fair market value. This can result in considerable unfairness to the debtor, the owner of the property, who may wind up both losing the property (and any attendant equity) and becoming subject to an onerous deficiency judgment, while the creditor may realize a substantial profit on ultimate disposition of the property and collect the deficiency from the debtor's other assets, if any. This problem can lead to abuse, an abuse which has been well documented and the subject of various attempts at legislative or judicial correction or amelioration.[1]

In this case the debtors, whose property became subject to a judgment lien after

---

1. *See generally,* Robertson, *The Problem of Price Adequacy in Foreclosure Sales,* 66 Canadian B.Rev. 671 (1987); Berger, *Solving the Problem of Abusive Mortgage Foreclosure Sales,* 66 Neb.

their default under two contracts by which they had purchased the property, attempt to invoke a New Mexico statute providing that the price at an *execution* sale shall be not less than two-thirds of the property's appraised value. They also seek to set aside the foreclosure sale by relying on the equitable doctrine that permits a court to invalidate a judicial sale when the price is so low as to "shock the conscience" of the court. We hold that the statute is inapplicable to *foreclosure* sales and that the debtors, having been afforded opportunities to protect themselves from the consequences of an inadequate price and to provide evidence that the price *was* inadequate, cannot now avail themselves of that equitable doctrine. We also consider issues relating to the trial court's jurisdiction to enter a foreclosure decree in a suit on a real estate contract, as well as issues concerning the substantiality of the evidence to support the court's findings of fact. We hold that the trial court did not err in the proceedings that led ultimately to confirmation of the sale of the debtors' property, and we affirm its judgment.

## I.

The case has a simple factual history and a more complicated procedural one. The debtors, William and Josephine Csurilla, entered into two contracts to purchase the real property at issue from Calvin and Dorothy Armstrong on April 5, 1987. The contracts were more or less standard, long-term real estate contracts, prepared by the Csurillas' attorney. The two contracts covered adjacent parcels of land and improvements in Quemado, New Mexico. One cov-

ered a gasoline service station, with associated pumps, inventory, and a storage building (the "station contract"); the other covered an adjoining residential dwelling and garage-carport (the "house contract"). One well serves both the house and the service station; electrical, sewer and plumbing lines run through one property to the other; and the garage-carport and storage building share a common wall. The trial court found that the parties used two separate contracts for tax purposes and the convenience of the Csurillas and for no other reason.[2]

The purchase price under the station contract was $156,594, with $1,000 paid down and the balance payable in monthly installments of $1,122.31 commencing April 1, 1987.[3] The station property included approximately $28,600 in inventory. The purchase price for the house property was $75,000, on which $1,000 was paid down, another $52,000 credited by virtue of an exchange of property owned by the Csurillas in Lake Havasu, Arizona, and the deferred balance of $22,000 payable $194.42 per month. Thus, the total purchase price for the two properties was $231,594, and the total monthly debt service was $1,316.73.

Three months after signing the contracts, the Csurillas defaulted under the station contract. They continued making payments on the house contract and did not relinquish possession of either property. They continued to operate the station for a few months but closed it in November 1987. Mr. Armstrong retook possession of the station in September 1988, when the court appointed him as receiver to protect

L.Rev. 373 (1987); Washburn, *The Judicial and Legislative Response to Price Inadequacy in Mortgage Foreclosure Sales*, 53 S.Cal.L.Rev. 843 (1980). The Uniform Land Transactions Act (ULTA)—which, however, has not yet been adopted by any state—contains several provisions designed to prevent double recovery by creditors, protect debtors from the hardships of deficiency judgments and inadequately priced sales, and bring judicial sales into closer conformity with commercially reasonable, free-market transactions. *See* ULTA §§ 3–501 to –

513, 13 U.L.A. 599–622 (1977); Washburn, *supra*, at 936–37.

**2.** The Csurillas' daughter, Victoria L. Lamkin, was designated as copurchaser in the station contract. There was testimony that the Csurillas wanted to provide their daughter an interest in the station property.

**3.** There was also a balloon payment of $28,594 due on April 1, 1990.

the property. By that time, the property had deteriorated significantly in value; much of the inventory was depleted, and the station was in generally poor condition. It never reopened as a service station.

The Armstrongs took the position that each contract stood as security for the purchasers' obligations under the other and that they were entitled to repossess both properties. However, since the Csurillas refused to surrender the house, the Armstrongs commenced this action in December 1987, seeking a declaration that the house contract effectively cross-collateralized the station contract and that both contracts were in default. By their amended complaint, filed in March 1988, the Armstrongs sought a money judgment for the balance due under each contract, a declaration of cross-collateralization as just mentioned, and a decree of foreclosure with respect to the real estate subject to each contract. The Csurillas answered, and the case was set for trial on September 2, 1988. When the parties and witnesses appeared for trial, however, the Csurillas' attorney announced that he would probably have to testify on behalf of his clients, whereupon the court vacated the trial setting and conferred with counsel to determine what could be resolved by stipulation. Based upon the parties' agreement, the court entered a partial summary judgment in favor of the Armstrongs, awarding them a money judgment for the balance due on the station contract, declaring that the judgment would constitute a lien on the station property, entering a decree of foreclosure on this judgment lien, and directing that the property be sold at a judicial sale. All other issues raised by the pleadings—including whether the contracts collateralized each other, whether the Armstrongs were entitled to judgment for the balance due under the house contract, and whether the Armstrongs would be entitled to a deficiency judgment if the proceeds from the judicial sale did not equal the judgment awarded on the station contract—were reserved for future determination at trial. Immediately after entry of the partial summary

judgment, the Armstrongs filed a transcript of the judgment with the county clerk.

The Csurillas obtained a new attorney, and the special master proceeded with the judicial sale, selling the station property to the Armstrongs for $75,000. Over the Csurillas' objections, the court confirmed the sale and entered a deficiency judgment against them for $99,913. The court made findings of fact in connection with its order of confirmation, noting that the fair market value of the station property was far less than the amount of the judgment, but that the Csurillas had not requested an appraisal nor provided evidence concerning value. The court certified its order as a final judgment under SCRA 1986, 1–054(C)(1); and the Csurillas appealed to this Court, asserting that the Armstrongs were not entitled to a deficiency judgment (because the issue had been reserved for trial) and that the sale should not have been confirmed because (a) the sale price was less than two-thirds of the property's value, contrary to NMSA 1978, Section 39–5–5, and (b) the sale price was so low in relation to the value of the property as to shock the conscience of the court.

While the appeal was pending, the case proceeded to trial on the remaining issues in the summer of 1989 before a new district judge. The court found generally in favor of the Armstrongs and entered a final judgment in November 1989, awarding the Armstrongs judgment of $21,088 on the house contract, declaring that the judgment was a first lien against the house property, ordering a judicial sale of that property, the proceeds of which were to be applied (after expenses of sale) to the amounts due the Armstrongs under both the judgment and the September 1988 partial summary judgment, and foreclosing the Csurillas' interest in the real estate. In its findings of fact, the court found that the two contracts in effect constituted a single agreement, that a default under one was a default under the other, and that there had been no misrepresentation or

fraud on the part of the Armstrongs in negotiating the contracts with the Csurillas.

■ Meanwhile, the Csurillas obtained still another attorney. He negotiated with counsel for the Armstrongs and the parties entered into a stipulation, following which the Csurillas moved to dismiss the appeal. The Armstrongs did not respond to the motion. The stipulation provided that the station property and the house property should be resold at a new judicial sale and that the first judicial sale should be set aside "to the extent necessary" to accomplish the new sale. The stipulation also provided, "Defendant[s] may have the property appraised prior to Judicial Sale." We granted the motion to dismiss on the ground that the appeal was moot, observing that the previous foreclosure sale, which was being attacked on appeal, had been vacated by agreement and that the effect of this action necessarily was to abrogate the deficiency judgment, which had also been attacked on the appeal.[4]

The new judicial sale then took place in December 1989, with the Armstrongs buying in both properties for $90,000. As they had before, the Csurillas objected to confirmation of the sale, asserting that the property had been sold for less than two-thirds of its value as purportedly required by statute, that the court had no jurisdiction to order foreclosure in a suit for the balance due under a real estate contract, that such action was improper in any event, and that confirmation of the sale would result in an inequitable forfeiture of the Csurillas' rights to the property. The court conducted a hearing, received opinion testimony (but no appraisal) as to the value of the property, found that the sale was fair and

regular in all respects, and entered an order confirming it. The order also granted the Csurillas a one-month period in which to redeem the property (overriding the parties' stipulation that there could be *no* right of redemption after the sale[5]) and awarded the Armstrongs a deficiency judgment of $125,037. The Csurillas then, through a fourth attorney, took the present appeal to this Court.

On appeal, the Csurillas assert nine points of error, which we shall reorder and consolidate to some extent in our discussion in this opinion. Their first point is that the trial court lacked subject-matter jurisdiction to enter decrees of foreclosure in the Armstrongs' suit on the real estate contracts and that, in any event, it was legally improper to order foreclosure after the Armstrongs made an election of remedies to sue for the balances due under the contracts. Their second point raises substantial evidence issues: that the trial court's findings that there was no fraud in the inducement of the contracts and that the contracts in effect constituted a single agreement, in which a default under one was a default under the other, were not supported by substantial evidence. Their third point rests on a similar factual assertion: There was a mutual mistake of fact as to the remedies available to the Armstrongs in the event of a default by the Csurillas under one or both of the contracts; this mistake justified rescission or reformation of the contracts; and the court erred in not permitting the Csurillas to reopen the case to present evidence of this mutual mistake. Fourth, the Csurillas renew the contention on which they relied so heavily in the trial court: that the judicial sale should have been set aside as violating Section 39–5–5. And fifth, they argue that

4. We reject the Armstrongs' strenuous insistence that our dismissal of the first appeal constituted an adjudication on the merits of issues raised by the Csurillas on that appeal and was therefore "res judicata" as to those issues. The Armstrongs maintain that they did not agree to vacation of the first deficiency judgment; but, since they clearly agreed to vacation of the judicial sale (on which the deficiency was

based) "to the extent necessary" to conduct a new sale, vacation of the deficiency followed as a matter of course.

5. *Cf.* NMSA 1978, § 39–5–19 (Repl.Pamp.1991) (parties to mortgage or deed of trust may shorten redemption period to not less than one month).

the price at the sale was so low as to shock the conscience of the court and require the sale to be set aside to prevent a forfeiture. We shall consider each of these issues in turn.

## II.

### A.

The assertion that the lower court lacked subject-matter jurisdiction to enter a decree of foreclosure need not detain us long. We recently considered the topic of subject-matter jurisdiction in *Sundance Mechanical & Utility Corp. v. Atlas,* 109 N.M. 683, 789 P.2d 1250 (1990). There we took note of our previous statement in, *inter alia, Heckathorn v. Heckathorn,* 77 N.M. 369, 371, 423 P.2d 410, 412 (1967), that there are three aspects to jurisdiction: jurisdiction of the parties, jurisdiction of the subject matter, and power or authority to decide the particular matter presented. 109 N.M. at 686, 789 P.2d at 1253. The plurality opinion questioned whether there is now any utility to the distinction between the second aspect, subject-matter jurisdiction, and the third, power or authority to decide the particular issue. *Id.* at 686–87, 789 P.2d at 1253–54. But we did not resolve this question then and do not resolve it now.

The Csurillas' jurisdictional argument rests upon a notion similar to this supposed third aspect of jurisdiction—that the court may lack the power to grant a particular kind of relief in a particular kind of case. They point out that we have previously observed that

the word jurisdiction is often used ambiguously. In its stricter sense it is understood to indicate judicial authority over subject matter and parties; and, in a less strict sense, it is used to refer to the privilege and power of the court to grant specific relief in cases within such authority.

*Allstate Ins. Co. v. Firemen's Ins. Co.,* 76 N.M. 430, 432, 415 P.2d 553, 554 (1966). The Csurillas do not really question the trial court's subject-matter jurisdiction in this case, but they contend that the court lacked jurisdiction in the "less strict sense" to grant the specific relief of foreclosure.

This case is another example of the difficulties into which counsel and courts can be drawn by the loose use of the term "jurisdiction." Another formulation, similar to the one in *Allstate,* about the power of a court to grant specific relief was set out in *Federal National Mortgage Association v. Rose Realty, Inc.,* 79 N.M. 281, 442 P.2d 593 (1968). That was a mortgage foreclosure action in which a monetary judgment was awarded against the second mortgagee although it had not been requested in the pleadings. Upholding the second mortgagee's contention that this was error, we said:

The point has merit; there was a procedural denial of due process. A judgment may not grant relief which is neither requested by the pleadings nor within the theory on which the case was tried.

*Id.* at 282, 442 P.2d at 594.

■ In the present case, there is no problem whatever concerning the court's power to grant the relief of foreclosure. NMSA 1978, Section 39–4–13, specifically permits any person holding a judgment lien on New Mexico real estate to foreclose on the property "in the same manner as ordinary suits for the foreclosure of mortgages." Foreclosure was specifically requested in the Armstrongs' initial complaint, as well as in the first amended complaint upon which the case was tried; and the Csurillas in fact consented to a decree of foreclosure and a judicial sale of the station property at the partial summary judgment hearing in September 1988. We hold that the trial court had jurisdiction to grant the relief it did, foreclosure, in both its partial summary judgment of September 1988 and its final judgment of November 1989.

### B.

Jurisdiction aside, the Csurillas argue that it was simply improper for the court to

order foreclosure, because the Armstrongs, having elected to sue for the balances due under the contracts, were not entitled to the additional remedy of foreclosure on the underlying realty. The Csurillas point to the clause in each contract providing (as such clauses typically do):

If the Purchasers fail or neglect to cure any default with [sic] ninety (90) days after the date Sellers' default notice is mailed, then the Sellers may, at their option either declare the whole amount remaining unpaid to be then due and proceed to enforce payment of the entire remaining unpaid balance, plus any accrued interest, together with reasonable attorney's fees, or they may terminate Purchasers' rights to the Property and retain all sums actually paid as liquidated damages to that date for the use of the property, and all rights of Purchasers in the Property shall thereupon end.

The Csurillas contend that, after their default under the station contract, this clause put the Armstrongs to an election either to declare the contract balance due and proceed to enforce payment of that balance or to terminate the contract, "taking back" the property and retaining amounts previously paid as liquidated damages. The right of foreclosure, the Csurillas argue, was not one of the Armstrongs' options under the contract and was inconsistent with the nature of the contract as a contract, not a mortgage. *See Bishop v. Beecher*, 67 N.M. 339, 355 P.2d 277 (1960) (real estate contract is not a mortgage).

■ We agree with the Csurillas that after their default the Armstrongs were put to an election of remedies, but we disagree with their conclusion that foreclosure was improper. They rely primarily on *Graham v. Stoneham*, 73 N.M. 382, 388 P.2d 389 (1963), for the proposition that the vendor in this situation has an election of remedies. That case does indeed hold that the vendor who elects to repossess the property is precluded from then suing for the unpaid balance of the purchase price. The Csurillas invoke the converse of this

proposition, maintaining that when the Armstrongs elected to sue for the unpaid purchase price, they were precluded from thereafter repossessing the property. We agree that *Graham* is authority for this converse proposition, but we disagree with the Csurillas' characterization of what the Armstrongs did. The Armstrongs did not retake possession of the property; they sued to enforce payment of the debt and then, after securing a judgment for that debt, obtained an order that their judgment constituted a lien and that the lien was foreclosed.

There is no question that the trial court abbreviated the procedure contemplated by our statutes for foreclosure of a judgment lien. Under NMSA 1978, Section 39-1-6 (Repl.Pamp.1991), a money judgment rendered by the district court is to be docketed by the clerk of the court and a transcript of the judgment issued upon request of the parties. "The judgment shall be a lien on the real estate of the judgment debtor from the date of the filing of the transcript of the judgment in the office of the county clerk of the county in which the real estate is situated." *Id.* Then,

Any person holding a judgment lien on any real estate situated in this state may subject said real estate to the payment of his judgment by a foreclosure suit in any court of competent jurisdiction, such suit to be instituted and prosecuted in the same manner as ordinary suits for the foreclosure of mortgages, and the sale thereunder to be held in the same manner and subject to the same rights of redemption as in sales held under mortgage foreclosure decrees.

NMSA 1978, § 39-4-13.

■ While phrasing their argument in terms of "election of remedies," the Csurillas do not seriously contend that the provision in the contracts that after a declaration of default the sellers could "proceed to enforce payment of the * * * unpaid balance" should be ignored. They admit that the sellers could obtain a judgment for the contract balance, obtain a judgment lien by

filing a transcript of judgment with the county clerk, and then foreclose on that judgment lien by a suit under Section 39–4–13. Thus, their argument boils down to the assertion that the court could not compress the steps into a single proceeding and, having entered judgment for the balance due on the contract, declare that balance to be a judgment lien and award foreclosure without requiring the Armstrongs to institute a new proceeding.

The trial court, in a thoughtful opinion issued by Judge Smith at the time the second sale was confirmed, held it could do exactly that. Citing 3 *American Law of Property* § 11.74 (1952), the court found its position supported by ample authority. We agree that, in a case such as this one, there is no reason to string out the proceedings into a series of steps, when the more expeditious and complete remedy for the judgment creditor is to enable him or her to proceed immediately with the further steps necessary to enforce payment of the judgment granted by the court. *See* 30 C.J.S. *Equity* § 104 (1965) (equity delights to do justice and not by halves).

We emphasize that the procedure employed by the court and the creditors in this case was valid absent a showing of prejudice to anyone, including the debtors. No rights of third parties were affected. If there were a contest, for instance, between a lien creditor and a judgment creditor, it might well be appropriate to require that the statute, Section 39–1–6, be followed to the letter—*i.e.*, that the judgment creditor be required to file a transcript of the judgment before perfection of the judgment lien would be recognized. Here, however, the contest was between the judgment debtors and the judgment creditors; the argument of the former that the latter had to go through a series of mechanical steps before obtaining relief through a judicial sale strikes us as rather artificial. Indeed, when the first foreclosure was ordered—foreclosure on the station property—the debtors *consented* to the judgment ordering foreclosure and agreed that a judicial sale should be held.

To say that the Armstrongs were properly granted this truncated form of relief is not to say that the relief was merely repossession of the property by another name, so that they really succeeded in electing *both* remedies, repossession and suit on the debt, contrary to the holding in *Graham v. Stoneham*. After the Armstrongs declared a default, the Csurillas continued in possession of the property, operating the station for a period of several months (and, apparently, permitting it to deteriorate in value) before closing it down. When the Armstrongs filed suit in December 1987, the Csurillas remained in possession of both properties until Mr. Armstrong was appointed receiver of the station in September 1988. During all this time, the Csurillas had the right to possession and the right to sell the property, pay off the judgment, and keep any profit. Even after a judicial sale was ordered, the Csurillas continued to own the property equitably and, at least in theory, could have tried to cause the price at the sale to be bid up for their economic benefit.

In the absence of meaningful prejudice to the Csurillas, we see no reason to require the procedural hoops to be jumped through purely for the sake of jumping through hoops. *See* SCRA 1986, 1–061 (court's action or omission will not justify reversal unless inconsistent with substantial justice). We hold that the court's procedure, in this instance, was permissible.

### III.

We deal rather briefly with the factual issues raised by the Csurillas. Those issues, again, are that the trial court's findings that (1) there was no fraud in procuring the contracts and (2) the contracts constituted a single agreement, so that a default under one was a default under the other, were not supported by substantial evidence. A third factual issue relates to the Csurillas' belated contention that the contracts were based on a mutual mistake—*viz.*, a mistake as to the relief to which the Armstrongs would be entitled in

the event of the Csurillas' default under one of the contracts—and that the mistake provided a basis for rescission or reformation of the contracts. The third issue was not raised until after the trial had been concluded and the final judgment entered; the Armstrongs moved for relief from judgment under SCRA 1986, 1–060(B), and for a new trial under Rule 1–059.

■ As to the substantial evidence points, counsel for the Csurillas has commendably complied with our Rules of Appellate Procedure, specifically SCRA 1986, 12–213(A)(3) (Cum.Supp.1991), which requires that the brief in chief set out the substance of the evidence supporting the trial court's findings. On review of the evidence listed there, we find that, on the misrepresentation point, Mr. Armstrong testified that he furnished complete and accurate financial documentation regarding the historical performance of the station to the Csurillas before the contracts were signed, that he did not misrepresent the historical financial performance of the station, and that the station performed poorly after the sale because of certain management shortcomings of the Csurillas. This and other evidence, particularly in light of the trial court's role as evaluator of the witnesses' credibility and finder of the facts, *Lewis v. Bloom,* 96 N.M. 63, 628 P.2d 308 (1981), was sufficient to enable a reasonable person to conclude that the Armstrongs did not misrepresent the historical financial performance of the station. *See Ortega v. Montoya,* 97 N.M. 159, 637 P.2d 841 (1981) (substantial evidence is such evidence as a reasonable mind might accept as adequate support for a conclusion). As is often the case in disputes like this, the Csurillas adduced considerable evidence to support their position that the Armstrongs had misrepresented the prior financial history of the station, but our system allocates to the trial court the task of resolving conflicts in the evidence or in the inferences to be drawn from the evidence. *See Lewis,* 96 N.M. at 65, 628 P.2d at 310.

■ Similarly, with respect to the unitary nature of the two contracts, the Armstrongs presented evidence that the parties initially contemplated a single contract covering both properties, with the Csurillas' attorney initially drafting such a contract, but that two contracts ultimately were used for the Csurillas' convenience and tax purposes, notwithstanding the Armstrongs' intention that, in the event of a default on either contract, they would "take back" both properties. There was other evidence, pro and con; the trial court found in favor of the Armstrongs, and we will not substitute our judgment for that court's on a factual issue like this one. *See Ortega,* 97 N.M. at 161, 637 P.2d at 843.

■ The "mutual mistake" issue revolves around the Csurillas' attempt, after the final judgment had been entered, to obtain relief from the judgment or a new trial. At the hearing on the motion, the Csurillas tendered evidence in the form of deposition testimony, given prior to completion of the trial, that the parties had not intended that the Armstrongs would be able to sue to recover the unpaid balance of the purchase price in the event of a default and that the Armstrongs' sole remedy, despite the express provision in the contract to the contrary, would be to retake possession of the property. This evidence was offered in support of a motion for relief from judgment under Rule 1–060(B)(1) on the ground that due to counsel's inadvertence or excusable neglect the evidence had not been adduced at trial, but would support rescission or reformation of the contracts. The court ruled that the Csurillas were represented by competent counsel, whose trial strategy may have included not submitting this evidence, and that its late proffer after entry of a final judgment did not justify setting aside the judgment. As to Rule 1–059(B), the motion was denied as untimely, coming as it did more than ten days after entry of the judgment.

The trial court was clearly correct and did not abuse its discretion. The proffered evidence was not "newly discovered" within the meaning of Rule 1–059, and the motion for new trial was untimely. Rule

1–060(B) was inapplicable; the rule does not permit a party to try a lawsuit in bits and pieces, saving some evidence and withholding some legal theories for later submission in the event of an unfavorable outcome. *See Benavidez v. Benavidez,* 99 N.M. 535, 539, 660 P.2d 1017, 1021 (1983) (Rule 60(b) cannot be used to relieve a party from the duty to take legal steps to protect his interests).

## IV.

The Csurillas renew their contention, asserted several times in the trial court and also on their first appeal to this Court, that the judicial sale of their property should not have been confirmed because the sale violated Section 39–5–5. That section reads as follows: "No real property shall be sold on any execution issued out of any court in any case at law for less than two-thirds of the appraised cash value thereof, exclusive of liens and encumbrances." Even though the statute on its face refers to sales on executions, not sales under court orders of foreclosure of liens (such as mortgages, judgment liens, mechanic's liens, etc.), the Csurillas make a colorable argument that the statute applies to such judicial sales as well. Their argument requires us to review the history of the relevant statutes and to clarify a possible source of confusion stemming from the organization of our compiled statutes on sales under execution and foreclosure.

As we have seen, Section 39–4–13 provides that a judgment lien may be enforced "by a foreclosure suit * * * to be instituted and prosecuted in the same manner as ordinary suits for the foreclosure of mortgages, and the sale thereunder to be held in the same manner * * * as in sales held under mortgage foreclosure decrees." There are no statutes prescribing the manner in which ordinary suits for the foreclosure of mortgages are to be conducted,

so the reference in this section to the manner of conducting such suits must be to the general practice in prosecuting all suits, both legal and equitable, under our Rules of Civil Procedure. As to the reference to "sales held under mortgage foreclosure decrees[,]" Section 39–4–13 is followed almost immediately in our compiled statutes by Article 5 of Chapter 39, entitled "Sales Under Execution and Foreclosure"; and the compiler has provided a cross-reference for Section 39–4–13 reading, "As to sales under execution and foreclosure, see [Article 5]."

The first section in Article 5, carrying the catchline "Time and notice of judicial sales," spells out the requirements for notice of a sale of "lands, tenements, goods or chattels ... by virtue of any execution or other process, including chattel or real estate mortgages * * *." NMSA 1978, § 39–5–1. The two succeeding sections likewise relate to sales under executions, orders, or other process. *See* §§ 39–5–2, 39–5–3. Skipping Section 39–5–4 (which relates only to personal property sold under executions when the property seized does not exceed $300 in value), one comes to Section 39–5–5, which carries the catchline "Limit on sale price of real estate" and refers, as noted above, only to sales under execution. The next nine sections all relate to how the sheriff conducting the execution sale shall attend to appraisal of the property to be sold, how the appraisers shall be selected and sworn, and what procedure shall be followed if the property levied upon is unsold. *See* §§ 39–5–6 to –14. With Section 39–5–15, Article 5 returns to the subject of foreclosures generally,[6] including the naming of unknown claimants in foreclosure proceedings and the important topic of redemption of property following a judicial sale. *See* §§ 39–5–15 to –23.

It is fairly easy to understand how a reader of our compiled statutes might begin with the first few sections in Article 5

---

**6.** Except Section 39–5–21, which applies to the redemption of real property sold under a writ of execution.

of Chapter 39 and assume that the procedures outlined in that article comprise the "manner * * * in sales held under mortgage foreclosure decrees" referred to in Section 39–4–13. Specifically, one might understand that the requirement in Section 39–5–5 that no real property shall be sold for less than two-thirds of its appraised cash value is intended to apply to mortgage or other foreclosure sales. In this the reader would be mistaken. For, while Sections 39–5–1 through 39–5–3 and 39–5–15 through 39–5–23 apply generally to foreclosures, Sections 39–5–5 through 39–5–13 apply only to sales and levies under writs of execution.

Section 39–5–5 originated in 1856–1857 N.M. Laws, Chapter 30, Section 1. As originally enacted, the statute read as it does today, except that the words "or order of sale" followed the word "execution" and the words "in any case at law" were not part of the original enactment. The section was amended in 1884 to read as it does presently; the amendment dropped the words "or order of sale" and added "in any case at law." 1884 N.M. Laws, ch. 11, § 1. As thus amended, the statute was carried forward in all subsequent compilations.[7] Its present placement in an article entitled "Sales Under Execution and Foreclosure" originated in the 1941 Compilation, in Article 2 of Chapter 21, which had the same title.[8] Thus, since 1941 our statute requiring that real property shall not be sold on execution for less than two-thirds of its appraised cash value has been compiled with other statutes relating to foreclosure sales generally, all under the title "Sales Under Execution and Foreclosure."

The other statutes on foreclosure sales, however, have different historical roots than Sections 39–5–5 to –13. Sections 39–

5–1 and 39–5–2 were enacted in 1895[9] and Section 39–5–3 was passed in 1887.[10] Sections 39–5–15 through 39–5–23 were all enacted in the 1930's and thereafter.[11] Also enacted in the 1930's was 1933 N.M.Laws, Chapter 7, entitled "An Act Relating to the Foreclosure of Judgment Liens." Section 1 of this act is now compiled as Section 39–4–13, and Sections 2, 3, and 4 are compiled as Sections 39–4–14, –15, and –16, respectively. Section 39–4–14 provides: "Neither the issuance or levy of execution shall be a prerequisite to the bringing of such suit [*i.e.*, a suit to foreclose a judgment lien], *nor shall any appraisal of the real estate be required.* " (Emphasis added.)

From this history, we see that Section 39–5–5, requiring sales on execution to bring a price of not less than two-thirds of the appraised value of the property, was enacted almost 150 years ago, whereas the statute providing for foreclosure of judgment liens was enacted in 1933. Although the original statute related to an "order of sale" as well as an "execution," the statute was amended in 1884 to delete the reference to an order of sale and to limit the execution to one issued "in any case at law." Executions, of course, were writs issued to enforce judgments rendered by the common-law courts before the merger of law and equity, *see* D. Dobbs, *Handbook on the Law of Remedies* § 1.3, at 10 (1973), while foreclosure actions originated in equity and have always been characterized as equitable actions, *see* H. McClintock, *Handbook of the Principles of Equity* § 3 (2d ed. 1948). The elaborate safeguards surrounding sales by the sheriff under a writ of execution in Sections 39–5–5 through 39–5–14 were not replicated when the legislature enacted the statutes pertaining to foreclosure of judgment liens. Instead, the

7. Compiled Laws of 1884, § 2171; Compiled Laws of 1897, § 3119; NMSA 1915, § 2202; NMSA 1929, § 46–113; NMSA 1941, § 21–205; NMSA 1953, § 24–2–5.

8. *See* NMSA 1941, § 21–205.

9. 1895 N.M.Laws, ch. 37, §§ 1–2.

10. 1887 N.M.Laws, ch. 36, § 4.

11. *See* 1937 N.M.Laws, ch. 134, § 1 (§ 39–5–15); 1934 N.M.Laws (Spec.Sess.), ch. 26, § 1 (§ 39–5–16); 1931 N.M.Laws, ch. 149, §§ 1–6 (§§ 39–5–17 to –18 and 39–5–20 to –23); 1957 N.M.Laws, ch. 109, § 2 (§ 39–5–19).

legislature provided simply that no "appraisal of the real estate [shall] be required." Section 39-4-14. The reason for this difference undoubtedly lies in the fact that foreclosure sales are carried out under the supervision of a court, while execution sales are conducted simply by the sheriff, with no order of confirmation by a court required and no other occasion specified for judicial oversight.

 It is thus not surprising that, as the Armstrongs argue, foreclosure sales, even though governed generally by Article 5 of Chapter 39 of our compiled statutes, are routinely conducted without any prior appraisal, by sheriff-appointed appraisers or by anyone else.[12] There is no provision in our statutes requiring confirmation of a judicial sale by the court that orders it, but such confirmation is always secured in cases in which property is sold pursuant to court order. We therefore hold that Section 39-5-5 does not apply to court-supervised foreclosure sales.

### V.

What protection, then, does a judgment debtor have from the potentially abusive practice described at the beginning of this opinion—sale for an inadequate price, followed by imposition of an onerous deficiency judgment? To answer this question we turn to the Csurillas' final contention—that the price bid by the Armstrongs for the combined house and station property, $90,000, was so low that it should "shock the conscience of the court."

In *Las Vegas Railway & Power Co. v. Trust Co. of St. Louis County*, 15 N.M. 634, 110 P. 856 (1910), we said:

"It is perfectly well settled that a judicial sale will not be set aside for inade-

quacy of price unless it be so gross as to shock the conscience, or unless there be additional circumstances which would make it inequitable to allow the sale to stand.

\* \* \* \* \* \*

While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale of property, courts are not slow to seize upon other circumstances impeaching the fairness of the transaction, as a cause for vacating it \* \* \*."

*Id.* at 649, 110 P. at 861 (quoting *Blanks v. Farmers' Loan & Trust Co.*, 122 F. 849, 851 (5th Cir.1903), and *Schroeder v. Young*, 161 U.S. 334, 337–38, 16 S.Ct. 512, 513, 40 L.Ed. 721 (1896)) (citations omitted); *see also City Builders Supply, Inc. v. Stone*, 81 N.M. 230, 230–31, 465 P.2d 287, 287–88 (1970); *Jones v. Page*, 26 N.M. 440, 445, 194 P. 883, 885 (1920), *cert. denied*, 256 U.S. 696, 41 S.Ct. 536, 65 L.Ed. 1176 (1921); *Gelfert v. National City Bank*, 313 U.S. 221, 232, 61 S.Ct. 898, 902, 85 L.Ed. 1299 (1941) ("while equity will not set aside a sale for mere inadequacy of price, it will do so if the inadequacy is so great as to shock the conscience or if there are additional circumstances against its fairness").

 From these various formulations, we discern two instances in which equity will intervene to set aside a judicial sale where the price, compared with the value of the property sold, is inadequate. The first is when the disparity is so great as to shock the court's conscience. While "mere inadequacy" will seldom be sufficient to justify vacating the sale, simply stating that rule obviously connotes *some* situations in which mere inadequacy, if sufficiently gross, will warrant the court's intervention.

---

12. In *Columbus Electric Cooperative v. Brown*, 77 N.M. 102, 103, 419 P.2d 757, 758 (1966), we said that "[t]he appraisal is an essential step in the statutory judicial sale procedure...." That case involved an execution sale by the sheriff, not a foreclosure sale under judicial supervision. We think the term "judicial sale" is ap-

plied more appropriately to the latter transaction than to the former. We agree with the holding in *Columbus Electric* that the appraisal is an essential step in the statutory procedure for a sale on execution, but not, as indicated in the text, in a judicial sale pursuant to a court order of foreclosure.

592

The second instance in which the sale may be vacated on the ground of price inadequacy is when, in addition to the inadequate price, there are circumstances which would make it inequitable to allow the sale to stand. We need not attempt to catalogue the kinds of "additional circumstances" contemplated by this branch of the rule,[13] because the Csurillas do not invoke it and contend only that the price for their property was so grossly inadequate that the court's conscience should have been shocked and the sale set aside on that ground alone.[14]

■ When will the disparity between price and value be so great that a court will be justified in setting aside a judicial sale, either because the inadequate price, by itself, is so low as to shock the court's conscience or because the inadequacy, while not so great, is combined with other circumstances resulting in unfairness to the debtor? Obviously, if *only* the inadequate price is relied on to invoke the court's equitable discretion, the inadequacy must be *very* great—gross—as compared with the inadequacy that will be sufficient when other, unfairness-producing circumstances are present. In *Las Vegas Railway*, the purchase price amounted to between 54% and 65% of the property's value and was held so inadequate as to warrant setting the sale aside, but other circumstances—

two parties interested in the sale were prevented from bidding—were present. *See* 15 N.M. at 648, 110 P. at 861. Other cases provide examples of situations in which courts have found prices bid at judicial sales inadequate under various circumstances. *See e.g., Chew v. Acacia Mut. Life Ins. Co.*, 165 Colo. 43, 437 P.2d 339 (1968) (en banc) (69% of appraised value shocked the court's conscience); *Straus v. Anderson*, 366 Ill. 426, 9 N.E.2d 205 (1937) (sale for 23% of value would shock average individual); *Home Owners' Loan Corp. v. Braxtan*, 220 Ind. 587, 44 N.E.2d 989 (1942) (17% of value set aside); *Suring State Bank v. Giese*, 210 Wis. 489, 246 N.W. 556 (1933) (bid of 20%–60% of property's value set aside). Professor Washburn, in Washburn, *supra* note 1, at 866, observes: "There is general agreement at the extremes as to what constitutes gross inadequacy. Sale prices less than ten percent of value are generally held grossly inadequate, whereas those above forty percent are held not grossly inadequate."[15]

The midpoint of Professor Washburn's range is 25%. We decline to adopt any fixed numerical percentage as establishing a price-value disparity that in every case will be so great as to shock the court's conscience. The answer to the question necessarily resides in the sound discretion of the trial court, *see City Builders;* and there are too many subtle variations in the

**13.** A listing, probably partial, is provided in *Las Vegas Railway*, 15 N.M. at 649–50, 110 P. at 861 (quoting *Schroeder*, 161 U.S. at 338, 16 S.Ct. at 513).

**14.** The Csurillas do contend in this part of their argument that confirmation of the judicial sale in this case results in a forfeiture of their equity in the property, which it will be recalled consisted of $2,000 in earnest money and $52,000 in the value of the Lake Havasu property traded to the Armstrongs when the contracts were signed. (Presumably, there would also be some amount representing principal payments made on the contracts while they were being performed.) They cite, *inter alia, Huckins v. Ritter*, 99 N.M. 560, 661 P.2d 52 (1983), for the propositions that equity abhors a forfeiture and that the literal terms of a contract will not be enforced when enforcement will result in a forfeiture which shocks the conscience of the court. However, forfeiture of the type disallowed in *Huckins* is

not involved in this case. What is involved here is a judicial sale for an assertedly inadequate price, which almost invariably will result in loss of the debtor's equity and perhaps other onerous consequences as well. To say that this case involves a "forfeiture" is simply another way of saying that the price paid by the purchaser at the judicial sale is so low that it should shock the conscience of the court.

**15.** Professor Washburn also notes that the debtor faces a heavy task in convincing a court that a foreclosure sale price is inadequate, since "[t]he court's inquiry into the adequacy of the foreclosure sale price is limited by two well-established principles: valuation of foreclosed property occurs at the date of the foreclosure sale, and the sale price is conclusive of the property's value." *Id.* at 858.

facts of this kind of case to make it feasible to lay down a fixed rule as to when a court's conscience should or should not be shocked.

■ The policy (not, as we have held above, the rule of law) reflected in Section 39–5–5—that sheriff's execution sales for less than two-thirds of the appraised value of the property should not be permitted—is perhaps instructive here. However, as we have said, there are significant differences between a sheriff's sale under a writ of execution and a judicially supervised sale under a court-ordered foreclosure. Where the inadequate price does not fall into the "shock the conscience" range (25% plus or minus 15%, for example), it may still be so inadequate (if less than two-thirds of the appraised value, for example) as to call for judicial invalidation of the sale if other circumstances, leading to unfairness, are present. We do not hold that in every case where the price falls below two-thirds of the fair market value, that price should be held inadequate as a matter of law, or that in every case where the price falls into the 10–40% range (or, conceivably, less) the inadequacy should shock the judicial conscience. We hold only that prices in these ranges call for special scrutiny by the court to be sure that, in the first case, additional circumstances do not produce an inequitable result and, in the second case, the grossly inadequate price is not confirmed absent good reasons why it should be.

In the present case, the purchase price for the combined properties was $90,000. The Csurillas complain that this was only about 39% of the property's value—assuming that its value was the amount they paid for it. There, however, is a major problem for the Csurillas' position in this case. They do not know; the court below did not know; we do not know—no one knows what the actual value of the property was at the time of the judicial sale.

We do know that included with the station property under the station contract was approximately $28,600 in inventory, much of which had been dissipated at the time of the sale. We also know that when the station contract was executed, the service station was operating and apparently making money; by the time of the sale, it had long since been closed and, according to the trial court, some or all of its "going concern" value was gone. In addition, as the court also found when the partial summary judgment was entered in September 1988, the station property had a fair market value "far less" than the amount of that judgment, the property having deteriorated significantly during the Csurillas' ownership. For all of these reasons, it seems likely (though we cannot be sure—no one can) that the sale price approached or exceeded 50% of the property's value.

■ How should a trial court proceed when it orders property subject to a lien sold after the lien is foreclosed and the debtor (or some other interested party) attacks the sale as having brought an inadequate price? Here, the debtors objected to confirmation of the sale on only a few, fairly narrow grounds (all of which are reviewed in this opinion): lack of subject-matter jurisdiction, election of remedies, inequitable forfeiture, and violation of Sections 39–5–5 *et seq.*, including sale for less than two-thirds of the appraised value of the property. Although none of these grounds was very specific in alleging any particular relationship between the sale price and the fair market value of the property, we may accept the Csurillas' claims that confirmation of the sale would result in an inequitable forfeiture and that the property had sold for less than two-thirds of its value as adequately asserting inadequacy of price when compared to market value. In this situation (and even had they failed to make any assertions about the adequacy or inadequacy of the price), the burden of proof to establish an unacceptable disparity between price and value was on the Csurillas. *See* 31A C.J.S. *Evidence* § 104 (1964) (burden of proof or persuasion as to fact or issue generally rests on party asserting or pleading it). In *First*

*National Bank v. Garrett*, 80 N.M. 239, 453 P.2d 759 (1969), we affirmed a foreclosure sale, noting that "the appellants did not offer to prove, nor do they claim that the price bid was inadequate, or that there was any unfairness in the manner in which the sale was consummated." *Id.* at 240, 453 P.2d at 760. *See also* Washburn, *supra* note 1, at 857, 859 (mortgagor bears burden of overcoming presumption that sale was proper; debtor must raise price inadequacy issue in foreclosure suit; debtor has heavy burden of proof to rebut presumption that sale price is adequate).

■ While the Csurillas claimed that the price was inadequate and now complain generally that consummation of the sale results in great unfairness to them, they do not contend that there was any impropriety in the conduct of the sale itself.[16] And they did not *prove*, or offer to prove, the extent, if any, to which the price fell short of the property's value. They did not, in other words, meet their burden to give the trial court sufficient *information* to enable it to exercise its discretion in passing upon the adequacy or inadequacy of the price and, if inadequate, whether the price was so low as to shock the court's conscience. They did not, despite the court's observation in September 1988 that they had not provided evidence of value and despite their own stipulation (when the first sale was set aside by agreement) that they could have the property appraised before the next sale, proceed with an appraisal or otherwise adduce evidence as to the fair market value of the property at the time of the sale.

There appears to be no question that the Csurillas made an extremely bad deal in purchasing this property. An economist, M. Patterson, testified that the value of the business conducted at the station property at the time the Csurillas purchased it was between $40,000 and $90,000 and that it could not support the debt service associated with the purchase. The Armstrongs made a correspondingly good deal in selling the property to the hapless Csurillas. But, so far as we can see on this record and as the trial court found, the Armstrongs did not make any misrepresentation or commit any other wrong in the transaction. It is not the function of courts to remake bad contracts that competent parties voluntarily make for themselves. It is the function of courts to right wrongs and correct injustices by applying legal rules and principles, but no violation of any rule or principle was brought to the trial court's attention and none has been brought to ours. The trial court ruled that the presumption of regularity attending the judicial sale, *see* 59 C.J.S. *Mortgages* § 752(e) (1949), had not been overcome; and it found, on competent evidence provided by the Armstrongs, that the price for which the property was judicially sold was fair under the circumstances. In this we cannot say the court abused its discretion.

The order confirming the sale and granting a deficiency judgment is accordingly affirmed.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM, J., concur.

---

16. Any such impropriety would be the kind of "additional circumstance" that, in combination with an inadequate price, might result in unfairness and so warrant setting the sale aside.