**Certiorari Granted, August 3, 2012, No. 33,709**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2012-NMCA-078**

**Filing Date: May 15, 2012**

**Docket No. 30,551**

**CHARTER BANK,**

**Plaintiff-Appellee,**

**v.**

**MARGRET FRANCOEUR,**

**Defendant-Appellant,**

**and**

**DARR ANGEL, TRUSTEE OF**
**THE DARR ANGEL LIVING TRUST,**

**Intervenor-Appellee.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**William G.W. Shoobridge, District Judge**

Little & Dranttel, P.C.
Peggy Whitmore
Albuquerque, NM

for Appellee

United South Broadway Corp.
Angelica Anaya Allen
Albuquerque, NM

for Appellant

Heidel, Samberson, Newel, Cox & McMahon
Michael T. Newell

1

Lovington, NM

for Intervenor-Appellee

**OPINION**

**WECHSLER, Judge.**

**{1}** In this foreclosure case, Plaintiff Charter Bank obtained a default judgment after Defendant Margret Francoeur failed to answer its complaint. After a special master sold Defendant's property at a public auction, Defendant moved to set aside the default judgment and to vacate the foreclosure sale. Defendant appeals two orders of the district court: (1) an order denying Defendant's motion to set aside the default judgment and to vacate the foreclosure sale and (2) an order setting supersedeas bond at $150,000 during the pendency of the appeal. We hold that the district court did not err in (1) denying Defendant's motion to set aside the default judgment because Defendant did not have a meritorious defense, (2) denying Defendant's motion to vacate the foreclosure sale because the sale's price-value ratio did not shock the conscience of the court and there were no additional circumstances impeaching the fairness of the sale, and (3) setting the supersedeas bond at $150,000. Accordingly, we affirm.

**BACKGROUND**

**{2}** Defendant and Plaintiff entered into a loan agreement (the loan) on March 26, 2007, secured by a mortgage on her residential property (the property) in Hobbs, New Mexico. On April 9, 2009, Defendant received a letter from Plaintiff that she was in default of the loan. Defendant contacted the Law Offices of T.W. Dvorak (the firm), a Florida-based law firm specializing in foreclosure defense that Defendant found on the internet. Defendant retained the firm to represent her and paid a $1500 retainer on June 23, 2009.

**{3}** On July 27, 2009, Plaintiff filed a complaint in foreclosure seeking an in rem judgment against the property and in personam judgment against Defendant. Plaintiff sought a judgment for the unpaid principal balance, interest, late charges, and reasonable attorney fees and costs associated with the unpaid loan secured by the mortgage on Defendant's property. After Plaintiff filed its complaint and served Defendant, Defendant provided the firm with the complaint. The firm failed to file an answer on Defendant's behalf, and the district court entered a default judgment in favor of Plaintiff on September 30, 2009. The district court awarded Plaintiff $90,467.68 as a judgment for the unpaid loan and ordered the property sold at a public auction.

**{4}** Following the default judgment, Defendant learned that the firm's principal attorney, Thomas Dvorak, was arrested for driving under the influence and driving with a suspended license in June 2009 after his involvement in a fatal car accident. Sometime during the summer or fall of 2009, a Florida court sentenced Dvorak to eight weeks imprisonment, and

2

Dvorak served his sentence from November 5, 2009 to December 27, 2009. Defendant ultimately learned about Dvorak's incarceration on February 23, 2010 after the Florida State Bar sent her a letter informing her that Dvorak was in alcohol abuse rehabilitation and counseling and that he was withdrawing from the practice of law.

**{5}** On January 8, 2010, Plaintiff informed Defendant that it transferred the servicing of the loan to U.S. Bank Home Mortgage (U.S. Bank). U.S. Bank is a participant in the federal Making Homes Affordable Program (HAMP). HAMP is a program established by the United States Department of Treasury (the treasury), pursuant to the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201 to -5261 (2008, as amended through 2009). HAMP allows the treasury to work with loan service providers to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C. § 5219(a)(1). In order to participate in HAMP, service providers must execute a servicer participation agreement with Fannie Mae. Treasury Supplemental Directive 09-01. U.S. Bank entered into a servicer participation agreement with Fannie Mae on August 20, 2009. In the servicer participation agreement, U.S. Bank agreed to comply with the guidelines and procedures issued by the treasury.

**{6}** Meanwhile, on October 7, 2009, the special master filed the first notice of sale on the property and scheduled the sale for November 24, 2009. Plaintiff advertised the property for sale in the Hobbs News-Sun from October 13, 2009 through November 3, 2009. The special master postponed the sale until January 12, 2010, although Plaintiff did not file notice of the postponement with the district court until April 21, 2010. The special master postponed the re-scheduled January 12, 2010 sale until February 16, 2010, and Plaintiff again filed notice of the postponement on April 21, 2010. The special master again postponed the re-scheduled February 16, 2010 sale and rescheduled the sale for April 20, 2010. On April 20, 2010, the special master sold the property at auction for $100,000 to Darr Angell, trustee of Darr Angell Living Trust (Angell). The special master filed the report of sale with the district court on May 6, 2010. On the same day, the district court issued an order approving the sale and the special master's report. The order provided Defendant a one-month redemption period, expiring on June 7, 2010.

**{7}** On May 27, 2010, Defendant filed a motion pursuant to Rule 1-060(B) NMRA to set aside the September 30, 2009 default judgment and to vacate the judicial sale of the property. Defendant argued that the representation by the firm, which included the failure to answer Plaintiff's complaint, was negligent and therefore excusable neglect. Further, Defendant argued that she had meritorious defenses to set aside the default judgment because (1) Plaintiff engaged in fraud, misrepresentation, estoppel, or other misconduct during the foreclosure sale by assuring Defendant that a loan modification was "imminent," Defendant never received notice of the judicial sale, and Defendant therefore did not explore other avenues to avoid foreclosure of the property; and (2) Plaintiff did not comply with treasury directives required by HAMP and the service agreements because Defendant's application for a loan modification was not evaluated within thirty days, she was not notified whether the application was accepted or rejected, and Plaintiff proceeded with the foreclosure sale

3

despite Defendant's pending application for a loan modification. Further, Defendant argued that the $100,000 sales price was "grossly disproportionate to the value of the home" and therefore was another ground for vacating the sale.

**{8}** Angell, as an intervenor, filed a response on June 10, 2010, and Plaintiff filed its response on June 14, 2010. The district court issued an order on July 9, 2010, denying the motion to set aside the default judgment and to vacate the sale. The district court determined that the default judgment resulted from excusable neglect based on the negligent representation of the firm but that Defendant did not have a meritorious defense. Regarding Defendant's defenses alleging fraud, other misconduct, or estoppel, the district court determined that Plaintiff and Defendant did not reach an agreement that foreclosure would be halted while various loan modification alternatives were being evaluated. Further, the district court determined that the $100,000 sales price was inadequate, but it did not "shock the [conscience] of the court" to justify setting the sale aside because there were no additional circumstances impeaching the fairness of the sale. Defendant filed a timely notice of appeal.

**{9}** On appeal, Defendant argues that the district court erred by (1) denying the motion to set aside the default judgment because Defendant had meritorious defenses because Plaintiff (a) failed to fulfill its contractual obligations under HAMP, (b) misrepresented to Defendant that she would receive a loan modification and was therefore estopped from proceeding with the foreclosure sale, and (c) engaged in bad faith by proceeding with the foreclosure sale even though Defendant's loan modification application was pending; (2) determining that the sale should not be vacated because the sales price did not "shock the court's conscience;" and (3) setting the supersedeas bond at $150,000 instead of the property's fair rental value.

**MOTION TO SET ASIDE DEFAULT JUDGMENT**

**{10}** In order to set aside a default judgment under Rule 1-060(B)(1), a court must determine that (1) the default judgment resulted from mistake, inadvertence, surprise or excusable neglect, and (2) the party seeking to set the default judgment aside had a meritorious defense. *N.M. Educators Fed. Credit Union v. Woods*, 102 N.M. 16, 17, 690 P.2d 1010, 1011 (1984). "If these two elements are found and there are no intervening equities in favor of the other party, a court should set aside the judgment." *Id.* Generally, "default judgments are not favored and a case should be heard on its merits whenever possible[.]" *Id.*

**Standard of Review**

**{11}** A grant or denial of a motion to set aside a default judgment rests within the sound discretion of the district court. *Gandara v. Gandara*, 2003-NMCA-036, ¶ 9, 133 N.M. 329, 62 P.3d 1211. We will only reverse the district court's grant or denial of a motion to set aside a default judgment for an abuse of that discretion. *N.M. Educators Fed. Credit Union*,

4

102 N.M. at 17, 690 P.2d at 1011.  "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153.  "However, because default judgments are generally disfavored, any doubts about whether relief should be granted are resolved in favor of the defaulting defendant and, in the absence of a showing of prejudice to the plaintiff, causes should be tried upon the merits."  *Gandara*, 2003-NMCA-036, ¶ 9 (alteration, internal quotation marks, and citation omitted).  When an argument that a district court has abused its discretion is premised on a misapprehension of the law, our review is de novo.  *See id.*

**HAMP**

**{12}** Defendant argues that the district court erred in determining that Defendant did not state a meritorious defense based on Plaintiff's alleged failure to follow HAMP guidelines that Plaintiff is contractually required to follow.  Particularly, Defendant argues that U.S. Bank violated treasury directives that require servicers to (1) suspend foreclosure sales when a borrower may be eligible for a loan modification under HAMP, (2) notify borrowers evaluated for but ultimately determined ineligible for a HAMP modification, and (3) extend the foreclosure time to allow the borrower to contest a denial of a HAMP loan modification.

**{13}** Defendant premises her argument on her assertion that she is an intended third party beneficiary of the servicer participation agreement between U.S. Bank and Fannie Mae and that U.S. Bank breached its contractual obligations contained in the servicer participation agreement and treasury directives as the servicer of the loan.  *See Fleet Mortg. Corp. v. Schuster*, 112 N.M. 48, 49-50, 811 P.2d 81, 82-83 (1991) (stating that a third party may have an enforceable right against an actual party to a contract if the third party is an intended beneficiary of the contract).  Whether Defendant is a third party beneficiary is a question of whether the actual parties intended the borrower to be a third party beneficiary.  *See id.* (stating that a third party is a beneficiary if the actual parties to the contract intended to benefit the third party).  "A prospective third[]party beneficiary may prove the intent of the parties to an agreement by relying on the unambiguous language of the agreement itself, or, in the absence of such language, on extrinsic evidence such as the circumstances surrounding the execution of the agreement[.]"  *Hansen v. Ford Motor Co.*, 120 N.M. 203, 205, 900 P.2d 952, 954 (1995) (citation omitted).  As a general rule, a member of the public is not an intended third party beneficiary and cannot enforce a government contract unless the contract's terms provide for liability.  Restatement (Second) of Contracts § 313(2)(a) (2011).

**{14}** Defendant cites *Huxtable v. Geithner*, No. 09cv1846, 2009 WL 5199333 (S.D. Cal. Dec. 23, 2009), and *Reyes v. Saxon Mortgage Services.*, No. 09cv1366, 2009 WL 3738177 (S.D. Cal. Nov. 5, 2009), for the proposition that a borrower is an intended third party beneficiary to a HAMP servicer participation agreement.  However, *Huxtable* dealt with an inapposite issue.  In *Huxtable*, the court addressed the sole issue of whether a servicer is a state actor and therefore subject to a due process claim. 2009 WL 5199333, at *1.  *Huxtable* does not address whether a borrower is a third party beneficiary to a HAMP servicer

5

participation agreement. *See Fernandez v. Farmers Ins. Co. of Ariz.*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993) ("[C]ases are not authority for propositions not considered." (internal quotation marks and citation omitted)). We acknowledge that *Reyes*, 2009 WL 3738177, at *2, held that a borrower's breach of contract claim against a servicer survived a motion to dismiss because "[a]rguably, one of the purposes of [a servicer participation agreement] is to assist homeowners, like [borrower.]" However, as Defendant concedes, this is the rule in only a minority of jurisdictions that have considered the issue.

**{15}** The vast majority of jurisdictions have rejected the arguments that a borrower has a direct cause of action under a HAMP servicer participation agreement or that a borrower can maintain a breach of contract under a third party beneficiary theory. For example, in *Parks v. BAC Home Loan Servicing, L.P.*, No. 3:11cv541, 2011 WL 5239240, at *2 (E.D. Va. Nov. 1, 2011), the court held that borrowers do not have a private cause of action to enforce HAMP regulations because borrowers are incidental beneficiaries, not third party beneficiaries under HAMP. Further, the court held that a borrower cannot maintain a breach of contract claim under state law to enforce contractual obligations based on a loan modification unless the cause of action relates to facts separate from a violation of HAMP requirements. *Id.* at *2-3; *see Sherman v. Litton Loan Servicing, L.P.*, 796 F. Supp. 2d 753, 765 (E.D. Va. 2011) ("[D]istrict courts have uniformly rejected the proposition that plaintiffs have standing to sue under HAMP, under a third[]party beneficiary theory or otherwise."); *see also In re Salvador*, 456 B.R. 610, 622 (Bankr. M.D. Ga. 2011) ("The courts have unanimously held that borrowers are not intended beneficiaries, but merely incidental beneficiaries to the contract between loan servicers and the government under the HAMP program."). We find the majority view persuasive.

**{16}** The courts that have held that borrowers are not intended third party beneficiaries to servicer participation agreements under HAMP and which, therefore, do not have a private cause of action, have relied on a variety of rationales. Several courts have determined that the terms of the servicer participation agreement between the servicer and Fannie Mae are dispositive. *See Edwards v. Aurora Loan Servs., LLC*, 791 F. Supp. 2d 144, 151-52 (D.D.C. 2011) (reasoning that, although the servicer participation agreement is a means of helping distressed homeowners, it does not evidence an intent to allow borrowers to enforce the agreement); *see also Speleos v. BAC Home Loans Servicing, L.P.*, 755 F. Supp. 2d 304, 310 (D. Mass. 2010) (same). Other courts have noted that allowing borrowers to enforce a servicer participation agreement potentially opens the door to "3-4 million homeowners filing individual claims." *Thomas v. JP Morgan Chase & Co.*, 811 F. Supp. 2d 781, 797 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). Another rationale has been that HAMP does not obligate a servicer to modify loans in that it only requires the servicer to consider eligible loans for modification, and therefore the agreements are unenforceable. *See Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1068-69 (N.D. Cal. 2011). In this case, Defendant does not point to any language of the specific servicer participation agreement applicable to this case to the effect that the agreement intended to provide borrowers with a right to enforce the agreement.

6

**{17}** Instead, Defendant argues that the "language of the federal legislation [enacting the HAMP programs] clearly shows that homeowners were intended beneficiaries of the HAMP program[s] and [servicer participation] agreements." Defendant argues that 12 U.S.C. § 5201, 12 U.S.C. § 5219, and 12 U.S.C. § 5220 provide unambiguous language that borrowers are intended third party beneficiaries of all HAMP servicer participation agreements. 12 U.S.C. § 5201(2)(A) and (B) identifies "protect[ing] home values" and "preserv[ing] homeownership," as purposes of the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5219 grants authority to the treasury to use its credit and loan guarantees to prevent foreclosures, and 12 U.S.C. § 5220 provides requirements for programs to assist homeowners. Although these statutes provide benefits to homeowners facing foreclosure, they do not contain any language indicating congressional intent to provide homeowners a right to enforce HAMP servicer agreements. *See Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741, 748 (E.D. Mich. 2010) ("[T]hird[]party beneficiaries cannot enforce government contracts absent a clear intent to the contrary, and . . . HAMP expresses no such intent[.]" (internal quotation marks and citations omitted)); *Waggoner v. Town of Mesilla*, 2011-NMCA-041, ¶ 8, 149 N.M. 596, 252 P.3d 820 (stating that we employ the plain  meaning of the terms of a statute in order to determine legislative intent).

**{18}** We therefore hold that Defendant did not have a meritorious defense that Plaintiff failed to comply with its contractual obligations under HAMP. Defendant does not have a private cause of action under HAMP and cannot maintain a cause of action for breach of contract to enforce a HAMP servicer participation agreement, and, therefore, the failure of U.S. Bank to comply with HAMP does not provide a meritorious defense to the default judgment for foreclosure.

**Estoppel**

**{19}** Defendant next argues that the district court erred by determining that equitable estoppel was not a meritorious defense to the default judgment. Particularly, Defendant argues that Plaintiff should have been equitably estopped from proceeding with the foreclosure action and judicial sale while Plaintiff negotiated a loan modification with Defendant and, further, that Plaintiff told Defendant her application for a loan modification was likely to be approved, Plaintiff did not notify Defendant when her loan modification was rejected, and Defendant reasonably relied on Plaintiff's misrepresentations regarding approval of the loan modification and therefore did not pursue other options to prevent the sale of her property.

**{20}** "[T]he doctrine of equitable estoppel . . . is aimed at preventing a party from benefitting from deception or misleading conduct." *Mannick v. Wakeland*, 2005-NMCA-098, ¶ 28, 138 N.M. 113, 117 P.3d 919, *aff'd by Coppler & Mannick, P.C. v. Wakeland*, 2005-NMSC-022, 138 N.M. 108, 117 P.3d 914. "The conduct of the party to be estopped must be something which amounts either to a representation or a concealment of the existence of facts; and these facts must be material to the rights or interests of the party

affected by the representation or concealment." *Mannick*, 2005-NMCA-098, ¶ 28 (internal quotation marks and citation omitted). In order for a party to raise equitable estoppel, the following facts must be shown as to the party to be estopped: "(1) [c]onduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts." *Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc.*, 2000-NMSC-030, ¶ 9, 129 N.M. 677, 12 P.3d 431 (internal quotation marks and citation omitted). Further, "[t]he following elements must be shown as to the party claiming estoppel: (1) [l]ack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." *Id.* (internal quotation marks and citation omitted).

**{21}**     Defendant provides four factual assertions in arguing that Plaintiff falsely represented that Defendant's loan modification "was likely to be approved[.]" First, Defendant's affidavit accompanying the motion to set aside the default judgment reveals that the firm "repeatedly advised [her] that they were in constant contact with [Plaintiff] about [her] delinquency, and that a loan modification was imminent." However, Defendant's affidavit fails to identify how this representation by the firm, even if false, can be attributed to Plaintiff. Second, Defendant further relies on a series of emailcommunications she had with an employee of the firm to support the argument that Plaintiff represented that a loan modification was "imminent." However, the emailcommunications only reveal that an employee of Plaintiff told the firm that she had been in constant contact with Freddie Mac, that the process was "moving along smoothly" and would be quick, that a decision on whether the loan modification would be approved would not be made for at least ten days, and that Plaintiff would "push off [the] sales date" until a decision on the loan modification. When the firm informed Defendant of this exchange, Defendant asked an employee of the firm whether Plaintiff is "going to do the loan mod[ification,]" to which the firm's employee responded that Plaintiff's employee "felt confident that everything would be fine." These emailcommunications make clear that, although Plaintiff represented that it believed Defendant's application for a loan modification would be approved, the decision had not been made; there was no false representation that Defendant would receive a loan modification. Third, Defendant states that the same employee of Plaintiff who had communicated with the firm personally told her that a loan modification was "imminent." However, based on the content of the email-communications, Defendant was aware that a decision had not been made as to whether she would receive a loan modification. As a result, this statement did not rise to the level of a misrepresentation that Defendant would receive a loan modification. Fourth, Defendant further argues that she received "regular letters . . . which provided every indication that [her] mortgage relationship with [Plaintiff] would be continuing." The first letter, from Plaintiff and dated January 8, 2010, notified Defendant that U.S. Bank would be the new servicer of the loan. The second and third letters, dated February 18, 2010 and March 3, 2010, respectively, appear to be form letters U.S. Bank sent to its existing customers encouraging existing mortgagors to apply for a

8

HAMP loan modification. The fourth letter, dated April 13, 2010, informed Defendant of a shortage in her escrow account. None of these letters can be construed to contain a false representation that Defendant's application for a loan modification would be approved. The district court therefore did not err in determining that estoppel was not a meritorious defense because Plaintiff did not make a false representation or conceal material facts regarding Defendant's application for a loan modification.

**{22}** We note that Defendant argues that this case is factually similar to *Aceves v. U.S. Bank, N.A.*, 120 Cal. Rptr. 3d 507 (Ct. App. 2011), and thus compels a similar result. In *Aceves*, the court held that the plaintiff adequately pled a claim for promissory estoppel based on the defendant's clear and unambiguous promise not to proceed on the foreclosure of the plaintiff's home without first negotiating a loan modification. *Id.* at 513-14. The plaintiff relied on the promise in deciding to forego chapter 13 bankruptcy proceedings, which would have allowed the plaintiff to discharge her mortgage debt. *Id.* at 515-16. However, as we have determined in this case, Plaintiff did not promise or make a false representation to Defendant, and, therefore, this case is distinguishable from *Aceves*.

**Bad Faith**

**{23}** Defendant next argues that Plaintiff failed to meaningfully engage in the loan modification process and that Plaintiff's actions constitute bad faith. *See Sanders v. FedEx Ground Package Sys.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449, 188 P.3d 1200 ("New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract."). In making this argument, Defendant relies on the assertions stated in the previous sections that Plaintiff misrepresented that Defendant would receive a loan modification, failed to notify Defendant that her application for a loan modification was denied, and therefore induced Defendant to not pursue other options to avoid foreclosure. Additionally, Defendant argues that Plaintiff scheduled and intended to conduct the judicial sale while Defendant's application for a loan modification was pending.

**{24}** However, Defendant did not preserve the issue in the district court. "To preserve a question for review[,] it must appear that a ruling or decision by the district court was fairly invoked[.]" Rule 12-216(A) NMRA. In order "[t]o preserve error for review, a party must fairly invoke a ruling of the district court on the same grounds argued in this Court." *Roark v. Farmers Group, Inc.*, 2007-NMCA-074, ¶ 38, 142 N.M. 59, 162 P.3d 896 (internal quotation marks and citation omitted).

**{25}** In her motion to set aside the default judgment and vacate judicial sale, Defendant argued that she had meritorious defenses of Plaintiff's failure to adhere to the requirements of HAMP, estoppel, fraud, misrepresentation, "or other misconduct." Defendant did not specifically raise a bad-faith defense and therefore did not fairly invoke a ruling by the district court. Defendant's assertion is not specific enough to satisfy the preservation requirements for a defense of bad faith. *See Kilgore v. Fuji Heavy Indus. Ltd.*, 2010-NMSC-

9

040, ¶ 26, 148 N.M. 561, 240 P.3d 648 ("A ruling or decision is fairly invoked if a party's objection or motion is made with sufficient specificity to alert the mind of the [district] court to the claimed error." (internal quotation marks and citation omitted)). We therefore decline to address the merits of Defendant's unpreserved argument. *See Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 14, 125 N.M. 748, 965 P.2d 332 (stating that this Court will not address issues not preserved for review).

**SALES PRICE**

**{26}** Defendant additionally argues that the district court erred in determining that the $100,000 did not "shock the conscience" of the court, based on our Supreme Court's decision in *Armstrong v. Csurilla*, 112 N.M. 579, 583, 817 P.2d 1221, 1225 (1991), because the sales price was 48.7% of the $206,000 appraised value of the home. The district court determined that the sales price was "inadequate" but that there were no additional circumstances that would impeach the fairness of the sale and that, therefore, the sales price did not shock the conscience of the court. Determining whether a price-value ratio is so great as to shock the conscience resides in the sound discretion of the district court. *See id.* at 592, 817 P.2d at 1234. We therefore review under an abuse of discretion standard.

**{27}** In *Armstrong*, our Supreme Court held that a court may set aside a foreclosure sale based on a grossly inadequate sales price or an inadequate sales price combined with "other circumstances" leading to unfairness. *Id.* at 593, 817 P.2d at 1235. Although, our Supreme Court "decline[d] to adopt any fixed numerical percentage as establishing a price-value disparity that in every case will be so great as to shock the court's conscience[,]" the Court provided guidance on the issue. *Id.* at 592, 817 P.2d at 1234. The Court held that when a sales price falls within the range of 10-40% of the appraised value of a property, the court must apply "special scrutiny . . . to be sure that . . . additional circumstances do not produce an inequitable result." *Id.* at 593, 817 P.2d at 1235. The Court further held that a sales price may still be inadequate if it falls within the range of 40-66% of the appraised value and there are additional circumstances regarding the sale leading to unfairness. *Id.* In this case, because the sales price was 48.7% of the properties appraised value, we do not apply special scrutiny in determining whether the circumstances of the sale caused an unfair result.

**{28}** Defendant points to several circumstances in arguing that, when combined with the inadequate sales price, the judicial sale led to an unfair result: (1) the firm's negligent representation resulting in the default judgment, (2) Plaintiff's and U.S. Bank's representations that a loan modification was "imminent," (3) Plaintiff's scheduling and conducting the foreclosure sale while Defendant's application for a loan modification was still pending, and (4) the special master's postponing the original sale and publishing and filing after the sale occurred. As discussed in addressing Defendant's estoppel, we disagree that Plaintiff and U.S. Bank misrepresented that Defendant would receive a loan modification. Further, we disagree that the record supports Defendant's argument that the foreclosure sale occurred while Defendant had a pending application for a loan modification. The foreclosure sale did not occur until April 20, 2010, after the denial of Defendant's

application for a HAMP modification on March 24, 2010, and the denial of all loan modifications on April 5, 2010. We therefore only address whether the firm's negligent representation and whether the unpublished and unfiled notices of postponement rose to the level of circumstances leading to unfairness invalidating the judicial sale.

**{29}** We do not give any weight to the firm's negligent representation leading to the default judgment as a circumstance leading to an unfair result in the judicial sale. Although the firm's representation led to the default judgment leading to the judicial sale, the firm no longer represented Defendant in the months proceeding the sale and had no involvement in the judicial sale. The firm's representation therefore did not impact the result of the sale.

**{30}** We further determine that the failure to publish or file the notices of postponement are not circumstances that led to an unfair result in the judicial sale. Defendant characterizes the failure to publish the notices of postponement as depriving potential buyers of the opportunity to learn of the sale and submit bids. *See Las Vegas Ry. & Power Co. v. Trust Co. of St. Louis Cnty.*, 15 N.M. 634, 648, 110 P. 856, 861 (1910) (invalidating a judicial sale where circumstances prevented "two parties vitally interested in the sale" from bidding on the property). However, the special master published the original sale date, time, and place for four weeks in the Hobbs News-Sun. Each subsequent notice of postponement assured that the parties present at the postponed sale would be notified and the new date and time would be confirmed as acceptable to all parties present. Defendant does not address how this procedure kept potential buyers from bidding on the property nor does she actually identify any potential buyers precluded from bidding on the property.

**{31}** We further note that the sales price of $100,000 was greater than the amount Defendant owed on the loan including costs and fees, and the sale therefore did not result in a deficiency judgment against Defendant. We consider the lack of a deficiency judgment a factor weighing in favor of finding that the foreclosure sale was fair. *See Armstrong*, 112 N.M. at 581, 817 P.2d at 1223 (stating that legislative or judicial attempts to invalidate foreclosure sales as unfair to the debtor are aimed to prevent situations where both the debtor loses the property and the sales price is so low as to result in a deficiency judgment). Because the circumstances of the foreclosure sale did not lead to an unfair result to Defendant, the district court did not abuse its discretion in determining that the sales price did not shock the court's conscience.

**SUPERSEDEAS BOND**

**{32}** Defendant lastly argues that the district court erred in setting the supersedeas bond at $150,000 instead of the fair rental value of the property. Specifically, Defendant argues that NMSA 1978, Section 39-3-9 (1933), mandates that "where title to real estate is involved, the rental value is an appropriate measure of damage for purposes of the supersedeas bond." It therefore appears that Defendant is essentially arguing that a district court abuses its discretion if it sets the supersedeas bond above the rental value of the property. Our review is governed by Rule 12-207(D) NMRA, which states that "[t]he

11

decision of the district court shall be set aside only if it is shown that the decision (1) is arbitrary, capricious or reflects an abuse of discretion; (2) is not supported by substantial evidence; or (3) is otherwise not in accordance with law."

**{33}** The relevant portions of Section 39-3-9 state that "[w]here an appeal is taken . . . from a judgment . . . of any district court involving the title to or possession of real or personal property, the [district] court shall fix the amount of supersedeas bond . . . for such sum as will indemnify the appellee for all damages that may result from such supersedeas[.]" Further, Section 39-3-9 provides that "the rental value, and all damages to improvements and waste, shall be considered elements of damages." By its plain language, Section 39-3-9 does not limit the supersedeas bond in this case to the rental value of the property. *See T-N-T Taxi, Ltd. v. N.M. Pub. Regulation Comm'n*, 2006-NMSC-016, ¶ 5, 139 N.M 550, 135 P.3d 814 ("We begin the search for legislative intent by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language[.]"). Section 39-3-9 directs a district court to set the supersedeas bond at an amount that indemnifies the appellee for "all damages" and states that the "rental value" of the property shall be considered an element of damages, not the sole measure. The district court therefore did not abuse its discretion under Section 39-3-9 by considering potential damages to Plaintiff outside of the rental value of the property.

**{34}** In addition, to the extent that Defendant argues that the $150,000 supersedeas bond is too high because it is three times the amount that Defendant informed the district court she would be able to post, we disagree. In setting the supersedeas bond, the district court correctly acknowledged that Section 39-3-9 requires the district court to indemnify an appellee for all damages that may occur as a result of the stay and that the amount is not dependent on the amount the appellant can pay. The district court therefore considered the lost rental value, interest Angell paid to Plaintiff for the property, damages to improvements and waste on the property, and Angell's potential lost profit if the property was to be purchased for resale. The district court noted that Defendant had the property appraised at $206,000 and that Angell purchased the property at auction for $100,000 for a potential profit of $106,000 if he were to resell the property. Considering the $106,000 in potential lost profit in addition to lost rental value, interest on money paid, and the potential for damage and waste to the property while this appeal was pending, the district court did not abuse its discretion in setting the supersedeas bond at $150,000, regardless of whether Defendant could only pay $50,000.

**CONCLUSION**

**{35}** The district court did not err in (1) denying Defendant's motion to set aside the default judgment because Defendant did not have a meritorious defense, (2) denying Defendant's motion to vacate the foreclosure sale because the sale's price-value ratio did not shock the conscience of the court and there were no additional circumstances impeaching the fairness of the sale, and (3) setting the supersedeas bond at $150,000. Accordingly, we affirm.

**{36}    IT IS SO ORDERED.**

_____

**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**CELIA FOY CASTILLO, Chief Judge**

_____

**LINDA M. VANZI, Judge**

**Topic Index for _Charter Bank v. Francoeur_, Docket No. 30,551**

**APPEAL AND ERROR**
Standard of Review

**CIVIL PROCEDURE**
Bad Faith
Default Judgment
Estoppel
Failure to Answer
Intervention
Supersedeas Bond
Third-party Actions

**PROPERTY**
Foreclosure