This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

### IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: <u>February 27, 2014</u>**

**BANK OF AMERICA NA as successor by merger to LASALLE BANK NA as trustee for MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, MORTGAGE LOAN ASSET-BACKED CERTIFICATES, SERIES 2007-2,**

Plaintiff-Respondent,

v.                                                      NO. 33,611

**GRACE QUINTANA,**

Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Valerie Ann Huling, District Judge**

Angelica Anaya Allen
Albuquerque, NM

for Petitioner

Lewis and Roca, L.L.P.

Jason Collis Bousliman

Daniel M. Hill

Albuquerque, NM

for Respondents


Nancy Ana Garner

Santa Fe, NM

for Amicus Curiae Professor Nathalie Martin


Frederick M. Rowe

Santa Fe, NM

Daniel Yohalem

Santa Fe, NM

Katherine Elizabeth Murray

Santa Fe, NM

for Amici Curiae Santa Fe Neighborhood Law Center et al.

**DECISION**

**DANIELS, Justice.**

{1}     This case requires us to address several problematical and recurring issues in New Mexico home mortgage foreclosure proceedings, including (1) the kind of evidence required to establish standing to foreclose, (2) the extent to which a holder in due course may be subject to a borrower's enforcement defenses based on claims

that the original lender violated New Mexico's Home Loan Protection Act, and (3) the extent to which a bank must negotiate in good faith on loan modification before foreclosing. Based on our resolution of the first two issues, we hold that a foreclosure summary judgment was improperly granted in favor of the Bank of America, and we reverse the district court and Court of Appeals. As to the third issue, we affirm the district court's grant of summary judgment. Because this appeal raises no novel issues of law, we issue an unpublished decision pursuant to Rule 12-405(B) NMRA.

## I.     BACKGROUND

{2}     In 2007, Erasmo and Grace Quintana signed a residential mortgage loan with First Franklin Financial Corp. (First Franklin Financial), an operational subsidiary of Merrill Lynch Bank & Trust Co. The $152,000 loan allowed them to pay off an existing loan on their Corrales home and provided them with an $11,773.70 cash payout.

{3}     The adjustable rate home loan contract was a promissory note that set an initial interest rate of 6.9 percent, which could increase to as much as 12.9 percent on a schedule of prescribed "change dates" starting in 2009. The Quintanas' home secured the note, as evidenced by the mortgage contract they signed with Mortgage Electronic Registration Systems, Inc. (MERS) as a nominee for First Franklin Financial.

{4}     Mr. Quintana died soon after signing the new loan. Mrs. Quintana made

payments on the loan to the loan servicer, First Franklin Loan Services, a different entity from First Franklin Financial, through October 2008.

{5}     On December 2, 2008, First Franklin Loan Services notified Mrs. Quintana that her loan was past due. The letter stated that if the past due amount was not paid by January 1, 2009, First Franklin Loan Services could accelerate the note and seek foreclosure. On January 29, 2009, another entity, LaSalle Bank NA (LaSalle), filed a foreclosure complaint against Mrs. Quintana in the Second Judicial District Court. In the foreclosure complaint, LaSalle alleged that it was the trustee for Merrill Lynch First Franklin Mortgage Loan Trust's mortgage loan asset-backed certificates, series 2007-2, which purportedly included the Quintanas' loan.

{6}     To support its claimed right to foreclose, LaSalle attached a copy of the Quintanas' note and mortgage to its complaint. LaSalle did not explain how it may have obtained the rights to those contracts, except for one conclusory allegation in its complaint: "Thereafter the Note and Mortgage were assigned to Plaintiff, which is the owner and holder in due course." The attached copy of the note had two differing indorsements, one specifically made payable to First Franklin Financial and one made payable in blank, although neither of the indorsements was dated. Both indorsements were made by the same person, labeled simply as "closer."

{7}     On March 5, 2009, just over a month after LaSalle filed its foreclosure

4

complaint, yet another entity, Bank of America NA (the Bank), filed an amended foreclosure complaint, identifying itself as the successor by merger to LaSalle and asserting authority to foreclose on the Quintana home. The amended complaint attached an additional document, a copy of a mortgage assignment from MERS to LaSalle dated January 29, 2009, but reciting a retroactive effective date of March 5, 2007, less than a week after the Quintanas signed the First Franklin Financial loan.

{8}     Mrs. Quintana answered the Bank's amended complaint with affirmative defenses that the Bank lacked standing to foreclose because it had not demonstrated a proper chain of title for the note, that the alleged MERS assignment of the mortgage was unsupported hearsay, and that the terms of the loan violated New Mexico's Home Loan Protection Act, NMSA 1978, §§ 58-21A-1 to -14 (2003, as amended through 2009) (HLPA), primarily because the loan's capped rate of 12.9 percent made it a high-cost loan. Mrs. Quintana argued that the HLPA triggers specific requirements before a creditor may issue a high-cost loan, including (1) ensuring that the borrower receives financial counseling, (2) assessing the borrower's repayment ability, and (3) giving the borrower specific notice that the loan is high-cost—steps that Mrs. Quintana alleges First Franklin Financial did not take. *See* § 58-21A-5 (2003) (providing limitations on creditors making high-cost loans).

{9}     The Bank replied to Mrs. Quintana's challenge of its standing by (1) arguing

that the MERS mortgage assignment established a "complete chain of title for the [m]ortgage," (2) attaching to its reply a new document showing that in October 2008, LaSalle became a part of the Bank by merger, as supported by a certificate of merger signed on February 5, 2009, with an effective date of October 17, 2008, and (3) stating that the Quintanas' original note was in the Bank's possession. Concerning the HLPA violation, the Bank argued that federal law preempted application of the HLPA to national banks based on the January 2004 Office of Comptroller of Currency (OCC) rules, as recognized by the New Mexico administrative code in 12.16.76.8(G) NMAC. Alternatively, the Bank argued that the loan did not violate the HLPA because the initial contract rate was 6.9 percent and the Quintanas defaulted before their loan reached the higher rate. In addition, the Bank argued that the cash payout provided the Quintanas with a reasonable, tangible net benefit as required by the HLPA.

{10} The Bank also filed a motion for summary judgment against Mrs. Quintana. The Bank attached the affidavit of Steven Baranet, vice president of Home Loan Services, Inc., the servicing agent of the Bank, to support its claim based on Baranet's review of the loan's servicing records that the Bank was the holder in due course of the Quintanas' note.

{11} Mrs. Quintana opposed the Bank's summary judgment motion, arguing that none of the Bank's evidence established it as the proper holder of the note; that the

6

loan violated the HLPA; and that an issue of material fact existed as to whether the denial of her loan modification violated the good-faith provision in New Mexico's Uniform Commercial Code (UCC), NMSA 1978, § 55-1-304 (2005), when her average monthly payment on her home loan exceeded her monthly disability income, her servicing letters came from First Franklin Loan Services and not Home Loan Services, and she continued to receive these letters addressed to her and her husband despite his death two years earlier. In response, the Bank provided (1) a transcript of phone logs related to Mrs. Quintana's requests for loan modification, arguing that her loan modification request was denied due to insufficient income, as evidenced by a denial letter sent by First Franklin Loan Services on October 15, 2009, (2) a resolution on signing authority effective November 1, 2008, by the board of First Franklin Financial authorizing Krystal Hall, the MERS officer who signed the mortgage assignment from MERS to LaSalle, to prepare documents in connection with its loans, and (3) a letter from First Franklin Loan Services to the Quintanas dated September 25, 2009, informing them that their loan modification under the federal Home Affordable Modification Program was denied, without indicating any reason for the denial.

{12}     The district court granted summary judgment to the Bank on all issues, finding that the Quintanas' note was "duly assigned and transferred to the [Bank]," giving it

standing to foreclose and making the Bank a "holder in due course." Accordingly, the Bank was allowed to proceed with foreclosure.

{13}     The Court of Appeals affirmed in a memorandum opinion. *See Bank of Am. v. Quintana*, No. 30,354, mem. op. at 7, 13-14 (N.M. Ct. App. Mar. 12, 2012) (nonprecedential) (holding that the Bank had standing to enforce the note in foreclosure, that the Bank as a holder in due course had an affirmative defense to the application of the HLPA, and that Mrs. Quintana failed to present evidence creating an issue of material fact warranting trial on any of her defenses). This Court granted Mrs. Quintana's petition for writ of certiorari.

## II.     DISCUSSION

## A.     Standards of Review

{14}     "This Court reviews de novo an order granting or denying summary judgment." *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 9, 285 P.3d 644. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 16, 141 N.M. 21, 150 P.3d 971 (internal quotation marks and citation omitted). "On review, we examine the whole record for any evidence that places a genuine issue of material fact in dispute, and we view the facts in a light most favorable to the party opposing the motion and draw all reasonable

inferences in support of a trial on the merits." *Handmaker v. Henney*, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879 (internal quotation marks and citation omitted). "The burden rests on the party moving for summary judgment to establish that no genuine issue of material fact exists for trial and that the movant is entitled to judgment as a matter of law. If the movant fails to meet this burden, summary judgment is erroneous." *C & H Constr. & Paving Co. v. Citizens Bank*, 1979-NMCA-077, ¶ 9, 93 N.M. 150, 597 P.2d 1190.

**B.     Summary Judgment Was Improper on the Issue of Standing**

{15}     As discussed more fully in *Bank of New York v. Romero*, 2014-NMSC-___, ¶¶ 14-38, ___ P.3d ___ (No. 33,224, Feb. 13, 2014), the Bank was required to demonstrate standing as a prerequisite to suit. *See* NMSA 1978, § 55-3-301 (1992) (defining who is entitled to enforce a negotiable interest such as a note).

{16}     Neither party disputes that Mrs. Quintana defaulted on her loan with First Franklin Financial after her last payment in October 2008. But it was LaSalle, and not First Franklin Financial, that filed the foreclosure complaint, alleging that it was entitled to enforce the First Franklin Financial note and foreclose on the Quintanas' house. Barely one month later, yet another claimant, the Bank, filed an amended complaint claiming that it was the proper party to seek foreclosure, based on a merger with LaSalle that allegedly occurred before the LaSalle foreclosure complaint was

9

filed.

{17} The Bank argues that it demonstrated standing because (1) copies of the note, the mortgage, and the MERS assignment of the mortgage attached to its amended complaint "show[ed] proper chain of title," (2) "it possessed the original note," and (3) it provided (a) the affidavit by Steven Baranet of Home Loan Services attesting that the Bank took the loan in good faith and without having received notice that Mrs. Quintana defaulted, and (b) a resolution by First Franklin Financial's board of directors authorizing Krystal Hall "to prepare and execute documents in connection with residential mortgage loans—including the execution of assignments." Our review of these documents indicates that the Bank did not establish standing to enforce the note in foreclosure.

{18} We begin our analysis by first looking at the transfer of the note. *See* 55 Am. Jur. 2d Mortgages § 584 (2009) ("A mortgage securing the repayment of a promissory note follows the note, and thus, only the rightful owner of the note has the right to enforce the mortgage."); *see also* § 55-3-301 (identifying the two types of persons entitled to enforce a note relevant to this case as "(i) the holder of the [note]" or "(ii) a nonholder in possession of the [note] who has the rights of a holder").

{19} When the Bank filed its foreclosure complaint, the only documents attached were a copy of the original note and mortgage signed by First Franklin Financial with

nothing more to support a chain of title from First Franklin Financial to LaSalle, the Bank, or any other entity. As discussed in *Bank of New York*, simply possessing a note is insufficient to establish a third party as the holder with the right of enforcement. *See* 2014-NMSC-___, ¶ 21 ("[A] third party must prove both physical possession *and* the right to enforcement through either a proper indorsement or a transfer by negotiation.").

{20}     The Bank argues that the blank indorsement of the Quintanas' note made it the holder of bearer paper with the right of enforcement. This argument ignores the fact that the note had two inconsistent undated indorsements, one in blank and one made payable specifically to First Franklin Financial. While the Bank asks this Court to infer that the blank indorsement occurred after the special indorsement, *see also Bank of Am.*, No. 30,354, mem. op. at 5-6 ("This [blank] endorsement meant that the note was payable to the note's bearer."), nothing in the record establishes that sequence. While it is possible that the note was first indorsed to First Franklin Financial and then indorsed in blank, it is equally plausible that the reverse occurred: that First Franklin Financial first indorsed the note in blank and then later indorsed it to itself to restrict payment. *See* NMSA 1978, § 55-3-205(c) (1992) ("The holder may convert a blank indorsement that consists only of a signature into a special indorsement by writing, above the signature of the indorser, words identifying the person to whom the

11

instrument is made payable."). This Court has recognized "[t]he principle here adopted [from Section 55-3-204(a) (1992) of the UCC] . . . that a special indorser . . . has the right to direct the payment and to require the indorsement of his indorsee as evidence of the satisfaction of own obligation" and that "[w]ithout such an indorsement, a transferee cannot qualify as a holder in due course." *Cadle Co. v. Wallach Concrete, Inc.*, 1995-NMSC-039, ¶ 14, 120 N.M. 56, 897 P.2d 1104 (second omission in original) (internal quotation marks and citation omitted). Here, the Quintanas' note contained an undated special indorsement, and, as we discussed in *Bank of New York*, nothing in our caselaw establishes that a special indorsement can simply be ignored in favor of a blank indorsement because doing so would disregard the rights identified by the special indorsement. *See, e.g.*, *Bank of N.Y.*, 2014-NMSC-__, ¶ 27 (rejecting the argument that a special indorsement could be ignored in favor of a blank indorsement). We conclude that the conflicting indorsements create a genuine issue of material fact as to whether the Bank is now the lawful holder of the note.

{21}     The Bank also argues that the assignment of the mortgage by MERS served to transfer the note to the Bank, an argument we rejected in *Bank of New York* and similarly reject here. As we explained in *Bank of New York*, MERS acted only as a nominee for the lender to track and record the mortgage lien through its electronic

12

database; therefore, MERS "lacked any authority to assign the [homeowner's] note." *See* 2014-NMSC-___, ¶ 35. The MERS assignment cannot substitute as a transfer of the note. The fact that the board of First Franklin Financial passed a signing resolution effective on November 1, 2008, authorizing Krystal Hall to prepare and execute documents on its behalf is immaterial. Even if we ignored decades of contract and property law principles and accepted the Bank's argument that the MERS assignment was meant to transfer the note, the backdated assignment conflicts with the past-due notices and modification letters sent to Mrs. Quintana by First Franklin Loan Services through October 2009. There still exists a dispute of material fact that anyone other than First Franklin Financial held the Quintanas' loan through late 2009, as reflected by the loan's servicing records alone.

{22}     Mrs. Quintana argues that the MERS assignment is invalid because it lacked a corporate seal or certification to authenticate it. While we recognize that "[f]or purposes of summary judgment, facts set forth in affidavits that are uncontroverted must be taken as true," *V.P. Clarence Co. v. Colgate*, 1993-NMSC-022, ¶ 7, 115 N.M. 471, 853 P.2d 722, we have also clarified that "[t]he *form* of summary judgment evidence itself does not have to meet the requirements of admissibility for trial evidence, but the *substance* of the evidence must be of a type that can be admitted at trial," *Seal v. Carlsbad Indep. Sch. Dist.*, 1993-NMSC-049, ¶ 14, 116 N.M. 101, 860

P.2d 743. Because Mrs. Quintana challenged the authenticity of the MERS assignment, the Bank was required to authenticate it, even for purposes of summary judgment. *See* Rule 11-901(A) NMRA (1993) (stating that the requirement of authenticating or identifying an item of evidence is "evidence sufficient to support a finding that the [item] is what its proponent claims."); *see also* Rule 11-803(F) NMRA (1993) (recognizing that records of regularly recorded business activity are an exception to the hearsay rule when the circumstances of the record keeping are testified to by a custodian or other qualified witness); *accord Levy v. Disharoon*, 1988-NMSC-009, ¶ 20, 106 N.M. 699, 749 P.2d 84 (rejecting the admissibility of letters, reports, sales agreements, and other documents kept by a title company because no custodian of records testified about the documents' trustworthiness as required by Rule 11-803).

{23}   The Bank argues that Steven Baranet, vice president of Home Loan Services, represented in his affidavit that as a custodian of the Bank's loan servicing records, the Bank "is presently the holder of said Note." However, Baranet must have personal knowledge to make such conclusory statements, as required by Rule 1-056(E) NMRA ("Supporting . . . affidavits . . . shall set forth such facts as would be admissible in evidence.") and Rule 11-602 NMRA (1993) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has

14

personal knowledge of the matter. Evidence to prove personal knowledge may . . . consist of the witness's own testimony."). Here, the record indicates that First Franklin Loan Services—and not Home Loan Services—serviced the Quintanas' loan until at least October 15, 2009, when Mrs. Quintana received the letter from First Franklin Loan Services denying her loan modification. Baranet, as an employee of Home Loan Services, did not establish he had personal knowledge to make statements about the record keeping practices of another company—First Franklin Loan Services—which calls into question whether Home Loan Services ever serviced the Quintanas' loan.

{24} In addition, none of the documents supporting Baranet's conclusory statements were attached to his affidavit, in violation of Rule 1-056(E) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith."). Baranet's sworn testimony concerning the loan records is nothing more than inadmissible hearsay and cannot substantiate either the transfer of the Quintanas' note to the Bank or the validity of the MERS assignment.

{25} Because none of the evidence produced by the Bank establishes a proper chain of title to prove that it is now the lawful holder of the Quintanas' note with the right of enforcement, there is a genuine issue of material fact as to whether the Bank has standing to foreclose. Accordingly, summary judgment in its favor was improper as a matter of law. As in *Bank of New York*, *see* 2014-NMSC-___, ¶ 38, this case

illustrates the importance of upholding the basic principles of property and contract law: that any party seeking to enforce a negotiable instrument must adequately demonstrate how it obtained the rights to do so in order to avoid multiple claims and unsupported lawsuits. For example, one amicus brief in this case alleges that, according to public documents, Fannie Mae acquired the Quintanas' note in 2007 and is suing Merrill Lynch because of the lack of underwriting standards for this loan series. Whatever facts may relate to the accuracy of that allegation, our laws must avoid creating the opportunity for multiple claims or lawsuits by improper parties.

**C.      Summary Judgment on Mrs. Quintana's HLPA Defenses Was Improper**

{26}      Neither the district court nor the Court of Appeals found it necessary to reach the merits of Mrs. Quintana's defenses based on HLPA violations in the underlying loan and mortgage transaction because both courts determined that the Bank had established that it was a holder in due course, a status all parties agreed would shield the Bank from application of the HLPA. *See Bank of N.Y.*, No. 30,354, mem. op. at 13-14.

{27}      New Mexico's UCC provides that a holder in due course is not subject to defenses of an obligor on an instrument based on claims that "arose from the transaction that gave rise to the instrument." *See* NMSA 1978, § 55-3-305(a)(3), (b) (1992, amended 2009). The UCC defines a holder in due course as a "holder" who

16

"took the instrument (i) for value, (ii) in good faith, and (iii) without notice that the instrument is overdue or has been dishonored." Section 55-3-302(a)(2) (1992).

{28}     Key to being a holder in due course is the term "holder." *See* NMSA 1978, § 55-1-201(21)(A) (2005) (defining "holder" as "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession"). For the same reasons that the Bank could not demonstrate that it was a holder of the Quintanas' note for purposes of standing, it cannot be a holder in due course for purposes of affirmative defenses, as we explained in *Bank of New York*, 2014-NMSC-___, ¶ 38:

> Because the transferee is not a holder, there is no presumption under Section [55-]3-308 [(1992) (entitling a holder in due course to payment by production and upon signature)] that the transferee, by producing the instrument, is entitled to payment. The instrument, by its terms, is not payable to the transferee and the transferee must account for possession of the unindorsed instrument by proving the transaction through which the transferee acquired it.

(quoting § 55-3-203 cmt. 2). Because the Bank failed to demonstrate how it became a holder of the Quintanas' note, it cannot be treated as a holder in due course. *See Ballengee v. N.M. Fed. Sav. & Loan Ass'n*, 1990-NMSC-008, ¶¶ 9-10, 109 N.M. 423, 786 P.2d 37 (rejecting a claim that a holder was entitled to payment on a note when the transfer of the note lacked a proper indorsement and therefore was not properly negotiated).

17

**{29}** Because neither the district court nor the Court of Appeals addressed the merits of Mrs. Quintana's HLPA claims as a result of their determinations that the Bank was a holder in due course, those substantive claims are not before us at this time. We note that one of the alternative arguments made by the Bank, federal preemption of the HLPA, has recently been decided by this Court. *See Bank of New York*, 2014-NMSC-___, ¶¶ 59-60 (holding that federal law does not preempt the HLPA, a consumer protection law of general applicability).

**D.      Summary Judgment Was Proper on the Issue of Loan Modification**

**{30}** Mrs. Quintana has argued that there are genuine issues of material fact as to the loan service provider's compliance with the policies of the federal Home Affordable Modification Program (HAMP). The Court of Appeals expressed doubt that "an equitable remedy was available to . . . Mrs. Quintana" in the form of a loan modification under HAMP. *See Bank of Am.*, No. 30,354, mem. op. at 15. The Court of Appeals also deemed it unnecessary to reach that legal issue because it determined that the Bank's evidence before the district court established that insufficient income disqualified Mrs. Quintana for loan modifications. *See id.* at 15-16.

**{31}** Just two months after filing its opinion in this case, the Court of Appeals squarely faced and decided the legal issue based on HAMP, the "program established by the United States Department of Treasury . . . [that] allows the treasury to work

18

with loan service providers to 'use loan guarantees and credit enhancements to prevent avoidable foreclosures.'" *Charter Bank v. Francoeur*, 2012-NMCA-078, ¶ 5, 287 P.3d 333, *cert. granted*, 2012-NMCERT-008, 296 P.3d 490, 491, *and cert. quashed*, 2013-NMCERT-004, 301 P.3d 858, 859 (quoting 12 U.S.C. § 5219(a)(1) (2012)). The Court of Appeals held with the vast majority of jurisdictions that have considered the question that a mortgagor "cannot maintain a [private] cause of action for breach of contract to enforce a HAMP servicer participation agreement," and that "the failure of [the loan service provider] to comply with HAMP does not provide a meritorious defense" to a foreclosure. *Id.* ¶¶ 5, 15, 18. Applying the precedent in *Charter Bank*, we decline to accept the argument that Mrs. Quintana had enforceable rights under HAMP.

**{32}** Mrs. Quintana also argues that we "should require that the financial institution show that it acted in good faith, as required by the UCC, in working with the homeowner to avoid foreclosure." *See* Section 55-1-304 ("Every contract or duty within the [UCC] imposes an obligation of good faith in its performance and enforcement."). This is clearly an attempt to turn alleged breaches of HAMP agreements, which mortgagors who are not parties to the agreements have no standing to enforce, into alleged violations of the UCC. It is a creative argument which has not been accepted by any court in this jurisdiction or elsewhere. The simple answer, as

19

with a direct HAMP claim, is that because Mrs. Quintana is not a party or even a third-party beneficiary to the agreement between the loan service provider and the federal government under HAMP, she cannot claim good faith and fair dealing rights that are enforceable only between parties to the contract. *See Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 10, 144 N.M. 449, 188 P.3d 1200 ("In essence, then, the implied covenant of good faith and fair dealing helps insure that both parties receive the benefit of their respective bargains. The covenant acts to protect the parties to the contract by prohibiting one party from obstructing the other party's benefit, whether that benefit is express or implied."); *Callahan v. N.M. Fed. of Teachers-TVI*, 2006-NMSC-010, ¶ 19-22, 139 N.M. 201, 131 P.3d 51 (concluding that the employees' claims for breach of implied covenant were subsumed within their claims for breach of the duty as third-party beneficiaries where employees were attempting to sue a union defendant for breach of the implied covenant of good faith and fair dealing as third-party beneficiaries to a collective bargaining agreement between the union and the employer).

{33}   We conclude that summary judgment as to the loan modification issue was proper as a matter of law. Accordingly we do not need to address whether the record before the district court reflected a genuine issue of material fact as to the loan service provider's compliance with HAMP guidelines.

20

## III.  CONCLUSION

**{34}**  We reverse the holding of the Court of Appeals and the grant of summary judgment by the district court on the issues of the Bank's standing, status as a holder in due course, and HLPA defenses. We affirm the district court's grant of summary judgment as to the loan modification issue under HAMP and the UCC. We remand to the district court for further proceedings consistent with this opinion.

**{35}**  **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**BARBARA J. VIGIL, Justice**

21